IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 7, 2010 Session

VICKI P. JACOBS, SURVIVING SPOUSE OF HARRIS N. JACOBS, DECEASED;
AND FOR THE BENEFIT OF HERSELF AND THE MINOR CHILDREN OF
HARRIS N. JACOBS, DECEASED v.
NASHVILLE EAR, NOSE & THROAT CLINIC ET AL.

Appeal from the Circuit Court for Davidson County
No. 01C-3462     Barbara N. Haynes, Judge

No. M2009-01594-COA-R3-CV - Filed July 15, 2010

This is a medical malpractice case. Vicki P. Jacobs ("the Plaintiff") alleges that the failure of Stephen A. Mitchell, M.D., an otolaryngologist, and K. James Schumacher, M.D., a neuroradiologist, to diagnose cancer in the left sinus of her late husband, Harris N. Jacobs ("the Decedent"), in May 2000 caused his death in November 2001. The trial court granted all defendants summary judgment. The court held that the Plaintiff, in the face of the defendants' motions for summary judgment, failed to demonstrate a genuine issue of material fact as to the element of causation. The court's ruling was premised, in part, on the court's holding that the affidavit of one of the experts was not timely filed and also because, according to the court, the Plaintiff's experts gave deposition testimony that superseded and canceled out their assertions in affidavits. Plaintiff appeals, challenging the court's grant of summary judgment and an earlier order allowing the defendants to conduct ex parte interviews of treating physicians of the Decedent. We vacate both orders and remand for further proceedings.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Vacated; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Larry D. Ashworth, Nashville, Tennessee, for the appellant, Vicki P. Jacobs, surviving spouse of Harris N. Jacobs, deceased, and for the benefit of herself and the minor children of Harris N. Jacobs.

E. Reynolds Davies, Jr., and John T. Reese, Nashville, Tennessee, for the appellees, K. James Schumacher, M.D., Associated Radiologists, P.C., and Radiology Alliance, P.C.

Robert E. Parker and Thomas W. Lawrence, Jr., Nashville, Tennessee, for the appellees, Stephen A. Mitchell, M.D., and Nashville Ear, Nose & Throat Clinic.

**OPINION**

I.

A.

The Decedent died November 22, 2001, at the age of 51. He was survived by his wife and two daughters. This action was originally filed by the Decedent. Following his death, the complaint was amended to allow his widow to continue this suit as a wrongful death action.

Defendant Dr. Mitchell is a board certified otolaryngologist. He practices in Nashville as part of Nashville Ear, Nose & Throat Clinic. The group was sued but only on the basis of Dr. Mitchell's alleged acts and omissions. Thus, where the context allows, we will refer to Dr. Mitchell or the Mitchell defendants.[1] Dr. Schumacher is a board certified neuroradiologist. He practices with Associated Radiologists, P.C., and Radiology Alliance, P.C. Again, where the context permits, we will refer to Dr. Schumacher or the Schumacher defendants.

B.

On May 14, 2000, the Decedent went to the emergency room at St. Thomas Hospital in Nashville with progressively worsening headaches after reportedly having had a cold for several days. At the hospital, a CT scan was performed on the Decedent's head and sinuses. He was discharged home with a prescription for an antibiotic and pain medication. He was told to contact Dr. Stephen A. Mitchell, or his partner, "to make sure that there is nothing else other than sinusitis going on here."

The symptoms returned, and the Decedent was admitted to the hospital on May 17, 2000, under the care of Dr. Mitchell. He responded well to IV antibiotics and steroids and

---

[1] The suit named as additional defendants entities apparently involved in some way in Nashville Ear, Nose & Throat Clinic. A full identification of these entities and their legal relationship to the Clinic are matters that are not germane to our resolution of the issues in this case.

was discharged on May 18, 2000, with instructions to continue oral medications and return to Dr. Mitchell in two weeks for a "recheck."

While the Decedent was at the hospital, Dr. Mitchell ordered an MRI which was performed on May 17, 2000, and interpreted by Dr. Schumacher. The impression was:

> 1) Complete opacification of a somewhat expanded appearing left sphenoid sinus, suggestive in appearance of a sphenoid sinus mucocele.
>
> 2) Extensive but partial opacification is also present in the right sphenoid sinus and posterior ethmoid air cells bilaterally, indicative of chronic sinusitis.
>
> 3) The study is otherwise normal.

Before leaving the hospital, the Decedent was given an appointment to see Dr. Mitchell on June 7, 2000. Dr. Mitchell's office later called and cancelled the appointment. Neither the Decedent nor Dr. Mitchell's office rescheduled.

In May 2001, the Decedent started to experience severe head and face pain. He was referred by his primary care physician to Dr. James Fordice, a physician in Dr. Mitchell's group. Upon performing a physical examination, including visualization of the sinuses, Dr. Fordice informed the Decedent that he suspected cancer. A biopsy confirmed Dr. Fordice's suspicion. His final diagnosis was ethmoid sinus cancer.

Dr. Fordice referred the Decedent to Dr. Steven A. Toms, a neurosurgeon who specializes in removing skull base tumors, and Dr. Stephen W. Bayles, an otolaryngologist who specializes in head and neck oncology and reconstruction. On June 17, 2001, Drs. Toms and Bayles attempted surgical removal of the tumor. They terminated the procedure upon determining that the cancer had spread to the point that they could not benefit the Decedent surgically. After a course of palliative radiation, the Decedent died on November 22, 2001, of complications from the cancer.

C.

After the Plaintiff's case had been pending for approximately two years, the Mitchell defendants and the Schumacher defendants filed separate motions for summary judgment. The Plaintiff responded to the motions with the affidavits of Dr. Allen D. Elster, Dr. Bayles,

and Dr. Toms. To differentiate these affidavits from later filings, we will refer to them as the 2003 affidavits.

Dr. Elster is a neuroradiologist who did *not* treat the Decedent. In his affidavit, Doctor Elster rendered opinions that arguably address both the standard of care and causation. As to causation, he stated:

> [I]t is my opinion within a reasonable degree of medical certainty . . . that his disease was diagnosable and operative in May of 2000, and more likely than not had the tumor been correctly diagnosed, it could have been surgically removed at that time.
>
> . . . [I]t is clear that the Defendants failed to timely and correctly diagnose the malady from which Mr. Jacobs suffered in May of 2000 which ultimately cost him his life.

Dr. Elster also stated that because of the defendants' negligence "Mr. Jacobs suffered damages and injuries that he would not have otherwise suffered."

In his affidavit, Doctor Bayles outlined his experience and qualifications as well as his involvement in the care of the Decedent. He stated as to causation that

> due to the lapse of time between May, 2000 and May, 2001, the cancer had become inoperable, and we were not able to save the life of Harris N. Jacobs.
>
> . . . . It is my opinion that had the tumor been correctly diagnosed in May of 2000, it could have been surgically removed at that time and Mr. Jacobs would have survived. More likely than not, Mr. Jacobs would be cancer-free after that date, and had the potential for a significantly longer life.

As to the subject of causation, Dr. Toms' 2003 affidavit was similar, but not identical, to the affidavit of Dr. Bayles:

> Unfortunately, due to the lapse of time between May, 2000 and May, 2001, the cancer had become inoperable, and we were not able to save the life of Harris N. Jacobs.

> I have reviewed the CT Scan and the MRI performed on Harris
> N. Jacobs in May of 2000, and it is my opinion within a
> reasonable degree of medical certainty based upon my education
> and training and personal involvement with Harris N. Jacobs
> that his disease was diagnosable and operative in May of 2000,
> and more likely than not had the tumor been correctly
> diagnosed, it could have been surgically removed at that time
> and Mr. Jacobs would have survived. More likely than not, Mr.
> Jacobs would have had a chance to be cancer-free after that date,
> or at least he could have had a chance at years of life.

The defendants removed their motions from the hearing docket and proceeded to take the depositions of Drs. Elster, Bayles and Toms. On August 2, 2004, the court, acting sua sponte, dismissed the Plaintiff's complaint for failure to prosecute. Upon the Plaintiff's motion, the court set aside the order of dismissal. The order setting aside the dismissal also granted the defendants' oral motion "to communicate *ex parte* with Harris Jacobs' treating physicians except Dr. Steven Toms and Dr. Ste[phen] Bayles." Eventually, the defendants privately interviewed several treating physicians, including Dr. Barbara Murphy.

The case was assigned a trial date of April 20, 2009. In February 2009, the defendants filed a new set of motions for summary judgment. The motions were based upon their assertion, among others, that the undisputed proof demonstrated that, in May 2000, the Decedent did not have a greater than 50% chance of surviving his cancer and that he would have died even if the cancer had been properly diagnosed and treated at that earlier time. The defendants supported their motions with affidavits and several deposition excerpts, including excerpts from the depositions of the Plaintiff's experts. The thrust of the motions was that the cancer was, by all accounts, a stage 4b cancer. According to defense expert Dr. Raefsky, a stage 4b cancer left the Decedent with a significantly less than 50% chance of survival. "Staging" in a cancer of this nature depends in large part on whether it has invaded bony structures and the dura, or lining, of the brain. Dr. Murphy supplied an affidavit to the same general effect as that of Dr. Raefsky.

Dr. Elster, in his deposition, criticized Dr. Schumacher for reporting, in 2000, a mucosele instead of a tumorous mass. According to Dr. Elster, a mocusele is a "big glob of infected goo" that is "confined to a sinus." Also, Dr. Elster testified as to what he saw on the 2000 films and differentiated it from a mucosele. Furthermore, he responded to questions concerning the extent of the tumor. According to Dr. Elster, the tumor did extend through the cribiform plate, the perforated bone at the rear of the nose between the eye sockets, and there was a "nub of tissue" extending toward the frontal lobes of the brain. Dr. Elster testified that the tumor showed no signs of "involvement of the brain," although "it probably

does involve the dura of the brain because I think it wouldn't be sticking up this far without locally involving the dura there."

In his deposition, Dr. Elster distanced himself from any opinion as to whether the outcome would have been different if the tumor had been diagnosed in 2000:

> I'm not here to opine on his ultimate outcome or his prognosis from any of this. . . . [H]e would have had an opportunity for a cure, an opportunity for surgical resection. Whether or not that affects . . . his actual prognosis or . . . probability of a cure . . . I'm not . . . an oncology expert. I'll . . . not say that.

Dr. Elster testified that his 2003 affidavit was meant to state that, in his opinion, if the tumor had been reported in May 2000, as it should have been, it would have been operable but not necessarily curable.

Dr. Bayles gave two depositions on August 30, 2005. The first was the discovery deposition taken by the defendants, and the second was taken by the Plaintiff to preserve the doctor's testimony for trial[2]. By agreement of the parties, the first deposition was incorporated as cross-examination into the second.

Under questioning by the defendants, Dr. Bayles agreed "that the American Joint Committee on Cancer Staging is the most authoritative source for staging cancer and predicting survivability." However, he qualified his agreement as follows:

> [With] sinus cancers, the staging criteria is a bit more – is a bit more unusual, in that because they're rare lesions, it does not correspond specifically all the time to its ability to be treated. Location of the tumor and the extent of the tumor defines whether or not it is a resectable disease and potentially treatable, more so than the actual stage itself.

---

[2]We realize there is no designation in the Rules of Civil Procedure of a "discovery" deposition and a "proof" deposition. However, Tenn. R. Civ. P. 32.01(3) gives a party the right to take a deposition of an adverse expert to discover the details of that expert's opinions without fearing that the deposition will be used as substantive proof at trial. Also, it is common practice for substantive expert testimony to be presented by deposition when the expert is not expected to testify live. It is in this sense, and not in a Rules-precise sense, that we have described the depositions of Dr. Bayles in this opinion.

-6-

Dr. Bayles testified that he had not "staged" the Decedent's cancer as it existed in May 2000. He also testified that, "based on the images," he did not believe the cancer had invaded the dura. He agreed that if the cancer had invaded the dura, "Mr. Jacobs survivability, if diagnosed and treated in May of 2000, would have been less than 50 percent."

In his deposition for proof, Dr. Bayles testified that he stood by his 2003 affidavit, and, in fact, a copy of the affidavit was made an exhibit to the deposition. He testified that, even though the May 2000 films showed the tumor was not benign because of "destruction of bone in the area of the sinuses," it was operable to a reasonable degree of medical certainty. Dr. Bayles gave the following response to the question of whether the Decedent would have survived had surgery been performed in May 2000:

> This appeared to be a local disease within the ethmoid cavity and, you know, when dealing with an individual it's either zero percent or 100 percent, and I think given the fact that it appeared that a reasonable margin beyond this tumor was obtainable and he could additionally receive adjunctive therapy, he had a realistic potential chance for survival. . . .

Dr. Toms considers himself to be a neurosurgical oncologist who specializes in skull base tumors such as the one the Decedent had. When asked to assume that the tumor had invaded the dura of the brain and to comment on the Decedent's survivability as of May 2000, Dr. Toms made it clear that he disagreed with the hypothetical in that it included facts "that at that time did not exist in my knowledge of the films." He then carefully explained that the dura is made up of multiple layers and that a tumor that is just touching the outermost layer is not as bad prognostically as one that had invaded all layers. The goal in any given surgery is to cut away the tumor and leave one intact layer of tissue separating the tumor from vital organs. This is what is meant by "clear margins." Dr. Toms testified that in this case it was "highly likely" he could have obtained clear margins in 2000 because it was highly likely that the tumor was, at most, just touching the outermost layer of the dura. Dr. Toms testified that there are "degrees of involvement" and, in an effort to circle back and answer the hypothetical, stated:

> If that tumor were just touching the dura and otherwise clean margins could be obtained everywhere else, then that still has a good survival, probably in the neighborhood in adenocarcinoma of the nose in the neighborhood of 50 percent over five years.
>
> If, however, both layers of the dura have been directly invaded and either the brain directly invaded or the spinal fluid space

invaded, the prognosis gets much worse, and the survival would probably drop to the neighborhood of 20 percent over five years.

At another point in his deposition, Dr. Toms testified that, if the dura was not involved, the Decedent's "five year survival would have approached 50 percent over five years." When again asked about the Dedendent's odds for survival, Dr. Toms testified as follows:

> To the best of my ability as a person involved in the care of patients with skull base tumors, I would suggest that he, depending on the radiology interpretations in 2000, again, how much dura was really involved or not involved, that he did lose somewhere between a 20 and 50 percent chance of being alive five years later. That would be my best estimate as a professional who does skull base tumors.

Dr. Toms testified that "five year survival" is the "commonly used verbiage" for defining survival of this type cancer.

In response to the motions for summary judgment, the Plaintiff refiled the 2003 affidavits of Dr. Elster and Dr. Bayles. The Plaintiff also submitted a "supplemental" affidavit from Dr. Toms. Paragraphs 11, 12 and 13 of the supplemental affidavit are, in pertinent part as far as this appeal is concerned, as follows:

> I have reviewed the CT Scan and the MRI performed on Harris N. Jacobs in May of 2000, and it is my opinion within a reasonable degree of medical certainty based upon my education and training and my personal involvement with Harris N. Jacobs that his disease was diagnosable and resectable in May of 2000, and more likely than not had the tumor been correctly diagnosed, it could have been surgically removed at that time and Mr. Jacobs would have survived. More likely than not, Mr. Jacobs would have had at least a 51% or better opportunity for a five year survival or greater if the tumor/mass he had in May of 2000 had been timely diagnosed and treated.

> This Affidavit represents a slight revision of my deposition testimony due to my having the opportunity to completely review the imaging studies for Harris Jacobs made in May of 2000, further review of the medical literature regarding skull base[] tumors and reviewing the pertinent testimony of Dr. Carl

-8-

Hampf, Dr. James Netterville, Dr. Ted Larson and Dr. Eric Raefsky.

Additionally, there was no biopsy performed in May of 2000 and as admitted by all of the experts involved in this matter it is impossible to know what type of cancer Mr. Jacobs had in May of 2000. Therefore, it is impossible for anyone to testify exactly what Mr. Jacobs' chances of survival were in 2000 without the benefit of a biopsy. What I can testify to within a reasonable degree of medical certainty as the only other neurosurgeon, is that Dr. Hampf has testified in May of 2000 the tumor/mass in Mr. [Jacobs'] head was resectable and based on the fact that the tumor/mass was resectable, at that time his chances of surviving for five years or longer was at least 51%.

D.

As we have stated, the trial court granted summary judgment to all of the defendants. The pertinent parts of the court's order are as follows:

Upon consideration of the supporting and opposing affidavits, the deposition testimony, the statements and responses filed in accordance with TRCP 56.03, the pleadings, the pertinent statutory and case authorities, the supporting and opposing briefs and arguments of counsel at the pre-trial conference, and the entire record, the court is of the opinion that . . . the motions for summary judgment filed by Defendants are well-taken, there is no genuine issue as to any material fact for trial as to the required element of causation under T.C.A. §29-26-115(a)(3), and Defendants are entitled to the entry of a judgment as a matter of law.

* * *

The court is striking the supplemental affidavit of Steven A. Toms, M.D. on several grounds including the fact that the affidavit was not timely filed or served. This affidavit was filed on 3/27/2009 less than 30 days before trial and more than 3 years after Dr. Toms' discovery deposition was taken on 1/11/2006. The court is also striking the 2003 affidavits of

-9-

Stephen W. Bayles, M.D. and Allen D. Elster, M.D. (filed on 3/27/2009) on several grounds including the fact that discovery depositions of each witness and an evidentiary deposition of Dr. Bayles were taken after each witness signed his affidavit and the deposition testimony therefore supersedes the earlier, affidavit testimony.

Further, even if the supplemental affidavit of Steven A. Toms, M.D. had been timely filed, the court would nonetheless exclude this affidavit testimony. Statements in Dr. Toms' supplemental affidavit and testimony given by Dr. Toms in his discovery deposition relating to the causation elements of Plaintiff's claim, including Mr. Jacobs' chances of surviving his underlying sinus cancer, are contradictory, speculative and indicate a lack of trustworthiness and therefore fail to create genuine issues of material fact for trial. Similarly, the court would still exclude the affidavits of Dr. Bayles and Dr. Elster signed in 2003 because relevant portions of these affidavits and the subsequent deposition testimony given by each witness relating to the causation elements of Plaintiff's claim, including Mr. Jacobs' chances of surviving sinus cancer, are contradictory, speculative and indicate a lack of trustworthiness and therefore fail to create genuine issues for trial.

Moreover, even if the deposition testimony given by Dr. Toms and Dr. Bayles is considered, the deposition testimony is speculative and fails to demonstrate that there is a genuine issue of material fact for trial on the causation elements of Plaintiff's claim, including the cause of Mr. Jacobs' death and whether Mr. Jacobs more likely than not would have survived his underlying sinus cancer if earlier diagnosis and treatment had been instituted by Defendants.

Defendants have appropriately negated an essential element of Plaintiff's cause of action and Plaintiff's evidence fails to demonstrate that there is a genuine issue of fact for trial on the issue of causation; i.e., whether Defendants caused the wrongful death of Harris N. Jacobs or whether Mr. Jacobs suffered injuries that would not otherwise have occurred if earlier

-10-

diagnosis and treatment of his sinus cancer had been instituted by Defendants. T.C.A. § 29-26-115(a)(3).

It is therefore ORDERED, ADJUDGED and DECREED as follows:

* * *

Defendants' summary judgment motions are granted and summary judgment is hereby granted in favor of all Defendants.

## II.

We are not satisfied with the parties' respective statements of the issues, so we have rephrased them to state the substance of what we must decide in order to respond to the thrust of those issues:

> Whether the trial court erred in finding that the defendants had negated causation, an essential element of the Plaintiff's case, and shifted the burden to the Plaintiff to come forward with evidence of causation sufficient to establish a genuine issue of fact.

> Whether the trial court abused its discretion in excluding the affidavit testimony of Dr. Bayles, Dr. Elster, and Dr. Toms on "numerous grounds" including nullification by contradictory deposition testimony.

> Whether the trial court erred in allowing the defendants to conduct ex parte interviews of the Decedent's treating physicians.

## III.

Our basic standard of review of orders granting summary judgment is as follows:

> Summary judgment is properly entered in favor of a party when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Because summary judgment involves only questions of law and not

-11-

factual disputes, no presumption of correctness attaches to the lower court's decision. Therefore, on appeal, we review the grant of summary judgment *de novo* to determine whether the precepts of Rule 56 have been satisfied.

***Fitts v. Arms***, 133 S.W.3d 187, 189 (Tenn. Ct. App. 2003) (citations omitted). However, because the trial court's dismissal was based on exclusion of evidence, we review that part of the order for abuse of discretion. ***Dubois v. Haykal***, 165 S.W.3d 634, 636-37 (Tenn. Ct. App. 2004). This is because questions regarding the admissibility of expert testimony are within the discretion of the trial court. ***Id.*** (*citing **McDaniel v. CSX Trans. Inc.***, 955 S.W.2d 257, 263 (Tenn. 1997)). An abuse of discretion occurs where the trial court has exercised its discretion based upon an incorrect legal standard, or has acted illogically or in a manner that causes an injustice to the complaining party. ***Mercer v. Vanderbilt Univ., Inc.***, 134 S.W.3d 121, 131 (Tenn. 2004).

IV.

A.

The most logical starting place is with the issue of whether the defendants shifted the burden to the Plaintiff to come forward with evidence on the issue of causation. If the defendants were not successful in their attempt to affirmatively negate causation, then the Plaintiff was under no obligation to counter the motion with proof of causation. ***McCarley v. W. Quality Food Serv.***, 960 S.W.2d 585, 588 (Tenn. 1998). The Plaintiff's primary argument is that "the Defendants altered their defense from 'Mr. Jacobs did not have cancer in May 2000' to 'Mr. Jacobs did have cancer in May 2000, but was going to die anyway,' which has resulted in a moving target with an abundance of contradictory, conclusory testimony based upon false premises all of which fails to negate an essential element of Plaintiff's claims." We note that the Plaintiff unsuccessfully moved the trial court to exclude the testimony of numerous defense witnesses on similar grounds. The Plaintiff has not raised that issue on appeal. Therefore, it is not necessary that we chase every point of the Plaintiff's dissatisfaction with defense witnesses to its absolute end. It is enough on this particular criticism of the defendants' position by the Plaintiff to note that a party is allowed to plead in the alternative that they were not negligent but that even if they were, their act or omission did not cause injury. *See* Tenn. R. Civ. P. 8.05(2). Since the law expressly condones such a pleading practice, it would seem strange to penalize a party because it produced testimony in support of alternative positions.

The Plaintiff attempts to seize on some perceived appearance of unfairness in the approach of the defendants, *i.e.*, in denying the existence of a tumor and then arguing that the

tumor seen by their expert was incurable. We do not believe this is an issue of fairness, but rather a not-to-be-unexpected consequence of the combination of (1) requiring a plaintiff at trial to bear the burden of proving all elements of the claim; (2) allowing parties to plead in the alternative; and (3) allowing a defendant to prevail on summary judgment by negating any one element while assuming, solely for the purpose of the summary judgment analysis, that others are proven. As to the latter, it is clear that, in seeking summary judgment, it is enough for a party to negate one element of a claim; it is not necessary that every element be negated. If any one element is negated, factual disputes as to other elements are immaterial to the issue of summary judgment. *See* **Byrd v. Hall**, 847 S.W.2d 208, 215 (Tenn. 1993). The existence of some elements of the claim can be assumed to exist, and summary judgment can still be granted if one element is shown beyond doubt to be absent. *See* Tenn. R. Civ. P. 56.03, 56.04. In our view, the fact that the defendants will not concede that the cancer was present or even visible in the May 2000 films does not defeat their ability to prevail if the medical proof establishes that whatever was there could not have been cured. The Plaintiff's arguments concerning the lack of consistency in the defense may hold some weight before a jury, but they cannot be used to change fundamental law.

Thus, the question boils down to whether the defendants supported their motions for summary judgment with expert testimony negating causation. We have no doubt that they did. In fact, the testimony of defense expert Eric L. Raefsky M.D., by affidavit and deposition, without more, was sufficient to trigger the shifting of the burden to the Plaintiff. Dr. Raefsky is licensed in Tennessee and has been since 1989. He is board certified in medical oncology. He has reviewed the medical records including the CT and MRI films taken in May 2000. According to Dr. Raefsky, the testimony of other witnesses and the films show that the Decedent's sinus cancer had invaded adjacent structures including bone and the dura of the brain. Any one of these numerous invasions would characterize the tumor as a stage T4 lesion, and the invasion of the dura would make it the most serious of such lesions and classify it as stage T4b. This means, according to Dr. Raefsky, that even if the tumor had been removed in May 2000, the Decedent would have had less than a 50% chance of surviving. As we have outlined above, Dr. Elster's testimony that the cancer had invaded the cribiform plate and that a "nub" of the lesion involved the dura of the brain corroborates the underlying basis of Dr. Raefsky's testimony.

The Plaintiff argues that the trial court erred in allowing the defendants to rely on Dr. Elster's testimony in view of the fact the court struck Dr. Elster's testimony. We note that the defendants had other sources showing that the tumor had extended into the bone of the skull and lining of the brain, so we are not convinced that the alleged error would make any difference in the final analysis. Nevertheless, we will address the Plaintiff's argument.

-13-

The Plaintiff relies upon **Shipley v. Williams**, No. M2007-01217-COA-R3-CV, 2009 WL 2486199 (Tenn. Ct. App. M.S., filed August 14, 2009) (*appeal granted* February 22, 2010). The Plaintiff's argument stems from an apparent misunderstanding of **Shipley** or the trial court's order in the present case. **Shipley**, in fact, supports the proposition that a moving party can rely on expert proof produced by a non-moving party to support the moving party's motion. **Id.** at * 5 (*quoting* **Martin v. Norfolk Southern Railway Co.**, 271 S.W.3d 76, 84 (Tenn. 2008)). The problem comes when, as in **Shipley**, the other party's expert proof relied on as a basis for summary judgment is inadmissible in its entirety by reason of the expert's lack of qualifications or competence. **Id**. The trial court in this case did *not* exclude Dr. Elster's testimony for lack of qualifications, nor did the court exclude the deposition testimony in part or in whole. Rather, it excluded his *affidavit* because "the deposition testimony . . . supersedes the earlier, affidavit testimony." Alternatively, the court found the affidavit testimony to be unreliable. We will address these two issues later. For now it is enough to say that the Plaintiff's reliance on **Shipley** is misplaced. We hold that the defendants successfully shifted the burden to the Plaintiff to come forward with evidence of causation.

B.

1.

We move now to the issue of whether the Plaintiff met the burden of producing competent proof of cause in fact. Since the complaint is predicated on a factual scenario reflecting that the Decedent suffered from an existing cancer when the defendants rendered "substandard" care in failing to diagnose the cancer, the requisite proof of causation falls under the rubric of **Kilpatrick v. Bryant**, 868 S.W.2d 594 (Tenn. 1993). **Kilpatrick** involved a doctor's failure to detect and report cancer as depicted in a mammogram study. Another doctor found it four months later. The complaint alleged that the four-month delay caused "more serious complications and a general worsening of her cancerous condition." **Id**. at 597. The only proof of causation was an expert's affidavit that stated:

> I am of the medical opinion, based on a reasonable degree of medical certainty, that the delay of four (4) months in the operation . . . increased the likelihood of Mrs. Kilpatrick suffering irreparable damage.

**Id**. The trial court granted summary judgment and this Court affirmed "on the basis that the physicians' affidavits supplied by the Plaintiffs in opposition to the motion for summary judgment did not establish that Mrs. Kilpatrick had suffered injuries that would not otherwise have occurred but for [the defendant's] negligence." **Id**. The Supreme Court granted the

"Plaintiffs' [Tenn. R. App. P.] 11 application to decide whether a cause of action for 'loss of chance' is cognizable in Tennessee." *Id*. at 596. The High Court held "that there can be no liability in a medical malpractice case for negligent diagnosis or treatment that decreases a patient's chances of avoiding death or other adverse medical condition where the death or adverse medical condition would probably have occurred anyway." *Id*. Another way of stating the Court's principal holding – one that has direct application to the present case – is by saying that "recovery is disallowed unless it can be shown . . . that it is more probable than not (greater than 50 percent) that but for the negligence of the defendant the plaintiff would have recovered or survived." *Id.* at 601.

2.

a.

With this background established we can consider the various issues related to whether the Plaintiff met the ***Kilpatrick*** standard. The issues revolve around the trial court's exclusion "on several grounds" of the affidavits of Dr. Bayles and Dr. Elster, as well as the supplemental affidavit of Dr. Toms. In our judgment, the only way to effectively handle these issues is to deal with each basis of the court's ruling with respect to each expert. We will begin with Dr. Bayles.

The first reason given for excluding the affidavit of Dr. Bayles was that he gave depositions after signing the affidavit. The court held that the depositions *therefore* superseded the affidavit. We disagree. We know of no rule of law or case holding that allows a court to ignore testimony given at one point in time for the sole reason that the same witness gave testimony at a later point in time. We do not believe this to be the law nor should it be. Even if there were such a rule of law, it would not be applicable to the present case. In the latest deposition of Dr. Bayles, the one taken by the Plaintiff to preserve the doctor's testimony for trial, he reaffirmed his affidavit and incorporated it as an exhibit to his deposition. The affidavit could not have been superseded by the deposition testimony for the simple reason that the affidavit was a *part* of the deposition testimony. We hold that it was error for the trial court to exclude the affidavit of Dr. Bayles on the ground that it was superseded by his deposition testimony.

b.

The second reason given by the trial court for excluding the affidavit of Dr. Bayles was that relevant portions of the affidavit and the subsequent deposition testimony "relating to the causation elements of Plaintiff's claim, including Mr. Jacobs' chances of surviving sinus cancer, are contradictory, speculative and indicate a lack of trustworthiness."

-15-

It is true that trial courts act as gatekeepers with regard to expert testimony; however,

> [a] trial court does not need to weigh or choose between two legitimate but conflicting scientific opinions, rather it must assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation.

*Dubois*, 165 S.W.3d at 637 (quotations marks and citations omitted).

We must conclude that the opinions of Dr. Bayles as to whether the Decedent would have survived if the cancer had been found in May of 2000 are based on "relevant scientific methods, processes and data, and not upon [his] mere speculation."[3]  *Id*.  At the beginning and near the end of his deposition taken by the Plaintiff, Dr. Bayles confirmed that the opinions he would express and had expressed were based on a reasonable degree of medical certainty.  Dr. Bayles is the doctor chosen by a member of Dr. Mitchell's group to attempt to save or extend the Decedent's life after the cancer had grown to the extent reflected in the June 2001 images.  The data that Dr. Bayles used was his own treatment of the patient and the films taken in 2000 and 2001.  Dr. Bayles explained the method, or operation, that would have been used in May of 2000 and testified that he had successfully performed this type of operation on other individuals.  Dr. Bayles described the procedure as a "widely accepted . . . standard skull base craniofacial operation."  Dr. Bayles testified that the tumor was operable in 2000 and explained why it was operable then as opposed to 2001 when he, along with Dr. Toms, had to abort their attempt to remove the tumor.  He explained that, in 2000, the tumor was confined to the sinus cavity "with only minimal extension. . . ."  When asked the ultimate

---

[3]Since the instant case does not involve an untested or novel approach to treating sinus cancer, we see no need to work through the factors set forth in *McDaniel v. CSXTransp., Inc.*, 955 S.W.2d. 257, 263 (Tenn. 1997). *See Brown v. Crown Equip. Corp.* , 181 S.W.3d 268, 272 (Tenn. 2005)(courts are not always required to consider the factors).  The *McDaniel* factors are:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye [ v. United States*, 293 F. 1013 (D. C. Cir.1923)], the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel*, 955 S.W.2d at 265 (bracketed material added).  In any event, were we to consider the factors, we would find that they weigh in favor of reliability with respect to Dr. Bayles's opinions.

question of whether and how long the Decedent would have survived had surgery been done in 2000, Dr. Bayles stated:

> This appeared to be local disease within the ethmoid cavity and, you know, when dealing with an individual it's either zero percent or 100 percent, and I think given the fact that it appeared that a reasonable margin beyond this tumor was obtainable and he could additionally receive adjunctive therapy, he had a realistic potential chance for survival based on the limits of the tumor at the time of original presentation.

The defendants argue that this statement contains an element of speculation in that it refers to "potential chance for survival" without stating a probability or placing a percentage on the Decedent's chances. Standing alone "chance" means very little and does not inform us whether it is greater than 50% or less than 50%. However, in his 2003 affidavit, Dr. Bayles stated, to "a reasonable degree of medical certainty" that "had the tumor been correctly diagnosed in May of 2000, it could have been surgically removed at that time and Mr. Jacobs would have survived." The next sentence adds, "[m]ore likely than not, Mr. Jacobs would be cancer-free after that date, and had the potential for a significantly longer life." As we have noted, Dr. Bayles testified in his deposition that he would "stand by the testimony in that affidavit."

The "cross-examination" of Dr. Bayles, taken from the discovery deposition and incorporated into the deposition taken by the Plaintiff for proof, does not change the underlying "methods, processes and data." At most, the cross-examination introduces the concept of "staging" into Dr. Bayles's[4] testimony on survivability. Dr. Bayles agreed that "the American Joint Committee on Cancer Staging is the most authoritative source for staging cancer and predicting survivability." However, he qualified his acknowledgment by stating that sinus cancers are "rare lesions" and that staging criteria do not always correspond to the "ability to be treated." Further, "[l]ocation of the tumor and the extent of the tumor define[] whether or not it is a resectable disease and potentially treatable, more so than the actual stage itself." Dr. Bayles agreed that if the cancer had invaded the dura as of May 2000, the Dededent's chances of survival were less than 50%. However, Dr. Bayles testified that "based on the images" he did not believe the cancer had invaded the dura.

---

[4]With respect to how we are using the possessive of Dr. Bayles's name, we have used an additional "s" to create the possessive because we believe this to be grammatically correct given the sound of his name.

c.

The final step that we employ before concluding our analysis of Dr. Bayles's testimony is to consider whether his deposition testimony nullified or canceled out his affidavit. The so-called nullification or cancellation rule was explained in some detail in **Church v. Perales**, 39 S.W.3d 149 (Tenn. Ct. App. 2000):

> Tennessee follows the rule that contradictory statements by the same witness regarding a single fact cancel each other out. The Tennessee Supreme Court has characterized mutually contradictory statements by the same witness as "no evidence" of the fact sought to be proved. However, in order to be disregarded under the so-called cancellation rule, the allegedly contradictory statements must be unexplained and neither statement can be corroborated by other competent evidence. When the cancellation rule is invoked at the summary judgment stage to challenge evidence opposing the motion, the courts must view the challenged evidence in the light most favorable to the opponent of the motion.

*Id*. at 169-70 (citations omitted). First, we do not believe the statement in Dr. Bayles's affidavit to the effect that the Decedent would more probably than not have survived and been cancer free to be inconsistent with the statement in the deposition that "he had a realistic potential chance for survival." To the extent the existence of an inconsistency may or may not be present (again, we repeat, we do not find one), it is our obligation on summary judgment to review the issue in "the light most favorable to the opponent of the motion," *id*. at 170, *i.e.*, the Plaintiff. Read in this light, Dr. Bayles holds the opinions (1) that the tumor had not invaded the dura so as to make the operation a losing proposition; (2) that the tumor could have been removed with reasonably clean margins left between the tumor and vital tissue; and (3) that the Decedent would have survived such an operation and remained cancer-free despite any technical staging number assigned to the tumor. It follows that the trial court erred in excluding the testimony of Dr. Bayles as untrustworthy. Dr. Bayles's affidavit established a genuine issue of material fact regarding the element of cause in fact. Our holding as to Dr. Bayles alone would require vacating the order granting summary judgment. Nevertheless, because this case is being remanded for further proceedings, we will consider the trial court's rulings as to Dr. Elster and Dr. Toms.

3.

We move now to Dr. Elster. We begin with the trial court's holding that his deposition superseded his affidavit. Even though we have stated that there is no rule whereby subsequent testimony automatically erases or supersedes earlier testimony by the same witness, that does not mean that a witness cannot abandon or limit an opinion to the point that it loses all force. That is what happened to Dr. Elster insofar as any opinion of the Decedent's survivability in May 2000. His affidavit was equivocal at best regarding the concept of survivability. He stated that, as of May 2000, the tumor "could have been surgically removed" and that the defendants' failure to diagnose the tumor "ultimately cost him his life." In his deposition, however, Dr. Elster disclaimed any opinion as to the ultimate outcome, assuming the tumor had been diagnosed in 2000. Dr. Elster stated, "I'm not here to opine on his ultimate outcome or his prognosis from any of this. . . ." In essence, Dr. Elster testified in his deposition that his affidavit was meant to state that in his opinion if the tumor had been reported in May 2000, as it should have been, it would have been operable but he did not have an opinion as to whether it was curable. Thus, even though we disagree with the trial court's terminology, we hold that the court did not err in refusing to consider Dr. Elster's affidavit on the issue of causation,[5] *i.e.*, whether the Decedent would have survived the tumor had the surgery been performed in May 2000.

4.

a.

We now consider the testimony of Dr. Toms and the trial court's rulings as to that testimony. First, we will consider the issue of whether the supplemental affidavit of Dr. Toms could not be used in opposition to the defendants' motions for summary judgment because it was not timely filed. The only explanation that the trial court gave in its order is as follows: "This affidavit was filed on 3/27/2009 less than 30 days before trial and more than 3 years after Dr. Toms' discovery deposition was taken on 1/11/2006." We do not understand the legal sufficiency of this rationale. The reason the affidavit was being filed at a time close to the trial date was that the motions for summary judgment were not filed until February 13, 2009, in the face of an April 20, 2009, trial date. Once the motions were filed, the Plaintiff had the right, and, in fact, the obligation, if her case was going to survive the defendants' motions, to "serve and file opposing affidavits not later than five days before the hearing." Tenn. R. Civ. P. 56.04; *see also* Tenn. R. Civ. P. 56.03 ("Any party opposing the motion for summary judgment must, not later than five days before the hearing, serve and

_____

[5]It goes without saying that Dr. Elster's testimony is arguably relevant and admissible on other elements of the Plaintiff's claim.

-19-

file a response to each fact set forth by the movant . . . . Each disputed fact must be supported by specific citation to the record."). Normally, we would accord considerable deference to the trial court's ruling excluding "untimely" evidence. We believe, however, that the exclusion of Dr. Toms' supplemental affidavit as untimely was an abuse of discretion because (1) it violates the timing scheme of the Rules of Civil Procedure, and (2) it resulted in an injustice to the Plaintiff. We understand that entertaining motions for summary judgment just days in advance of trial is not the ideal situation, but the trial court did not rule that the motions were late, or any of the other supporting papers were late. We do not see the justice in singling out one particular piece of evidence for exclusion on the basis of timing while allowing other arguably untimely papers. We note also that, when the supplemental affidavit of Dr. Toms is compared to his original 2003 affidavit, there is no element of surprise to the defendants. In both affidavits, Dr. Toms states that more likely than not the Decedent would have survived if the tumor had been found and reported in May 2000.[6] Accordingly, we hold that the trial court abused its discretion in excluding, as untimely, the supplemental affidavit of Dr. Toms.

b.

As to the methodology, processes and data employed by Dr. Toms, there is nothing unreliable about them. Our analysis on this issue is much the same as it was with the testimony of Dr. Bayles. Dr. Toms was chosen to perform the difficult surgery in 2001 and his data was the patient and the patient's actual records, including the films made in 2000. He is a doctor that specializes in performing life-saving procedures that involve the skull base. He practices his profession independent of litigation and his involvement in this case came about independent of litigation. He explained how the surgery would have been performed in 2000 on the basis of the same type of data and processes that he employs in his workaday world. His explanation of how a difficult tumor is removed, even though it has eroded bone in close proximity to the brain, was clear and logical. Even though it was the deposition testimony that contains the information we have outlined here, and not the supplemental affidavit, we have been furnished no reason for holding that the methods, processes and data employed in supplying the supplemental affidavit were somehow different from those outlined in the deposition. Thus, we hold that Dr. Toms' testimony was not unreliable and the supplemental affidavit should not have been excluded unless it either contradicted his deposition testimony or failed to pass the *Kirkpatrick* threshold of probability.

---

[6]For this same reason, we find no merit in the Schumacher defendants' argument that the Plaintiff waived any challenge to the error by not asking the trial court to extend the "disclosure" deadline or continue the trial. The substance of the testimony was disclosed in the 2003 affidavit.

We can collapse both questions into one, because, if there was any inconsistency between the supplemental affidavit and the deposition testimony, it was with respect to whether the Decedent had a 51% or better chance of survival in May 2000. Obviously, both the original affidavit and the supplemental affidavit pass the 51% threshold. The exact language in the original affidavit is that "more likely than not had the tumor been corectly diagnosed, it could have been surgically removed at that time and Mr. Jacobs would have survived." The same language is repeated in the supplemental affidavit, followed by a sentence that states, "More likely than not, Mr. Jacobs would have had at least a 51% or better opportunity for a five year survival or greater if the tumor/mass . . . had been timely diagnosed and treated." The concluding statement in the supplemental affidavit was that "in May of 2000 the tumor/mass in Mr. [Jacobs]' head was resectable and based on the fact that the tumor/mass was resectable, at that time his chances of surviving for five years or longer was at least 51%." Testimony in terms of a "probability," a "better than even chance", and "more likely than not" takes the proof out of the realm of speculation and into the realm that satisfies the traditional preponderance of the evidence standard. **Kilpatrick**, 868 S.W.2d at 599-603.

In his deposition, Dr. Toms testified that if the tumor was "just touching the dura . . . then that still has a very good survival, probably . . . in the neighborhood of 50 percent over five years." Later in the deposition, Dr. Toms stated that his "best estimate" as a person that performs these type surgeries was that "depending on the radiology interpretations in 2000, again, how much of the dura was really involved or not involved, that he did lose somewhere between a 20 and 50 percent chance of being alive five years later." As we noted when we first mentioned Dr. Toms' deposition testimony, however, he challenged the hypothetical that included, as a given, invasion of the dura.

There are several things that convince us the trial court should not have applied the rule of cancellation to Dr. Toms' supplemental affidavit. First, medical doctors are not trained in the law and are not expected to "speak with the precision of a hornbook on causation." **Miller v. Choo Choo Partners, L.P.**, 73 S.W.3d 897, 905 (Tenn. Ct. App. 2001). Second, the testimony in Dr. Toms' supplemental affidavit is "corroborated," both as to rationale and conclusion by the testimony of Dr. Bayles. As we have stated earlier, Dr. Bayles spoke in his affidavit, which he reaffirmed in his deposition, in terms of "more likely than not." His rationale was that, had surgery been performed in May 2000, the tumor would have been removed with clear margins. This is exactly the same rationale that Dr. Toms employed and made explicit in his supplemental affidavit. Third, if the apparent inconsistency is "explained," one statement will not nullify another. **Perales**, 39 S.W.3d at 170. Dr. Toms "explained" in his supplemental affidavit that it "represents a slight revision of my deposition testimony due to my having the opportunity to completely review the imaging studies . . . made in May of 2000" plus additional medical literature and other

testimony in the case. In his deposition, Dr. Toms noted that he was missing some images of the films in the critical area of the tumor. Finally, "there should not be a dismissal for inconsistency in testimony of a witness unless it represents an unequivocal and irreconcilable conflict."[7] *Gambill v. Middle Tenn. Med. Center*, 751 S.W.2d 145, 151-52 (Tenn. Ct. App. 1988). Any inconsistency between Dr. Toms' deposition testimony and his supplemental affidavit is not unequivocal and irreconcilable. His testimony that the patient's survivability in 2000 was between 20% and 50% seems to be based on the assumption, which he refused to adopt, that the cancer had invaded the dura. We have previously noted that both Dr. Toms and Dr. Bayles challenged this assumption. Testimony that survivability was in the "neighborhood" of 50% obviously is inexact and subject to being reconciled with latter testimony that survivability was 51% or better. When we combine all these mitigating factors and construe the testimony in the light most favorable to the Plaintiff, we conclude that the trial court erred in striking Dr. Toms' supplemental affidavit as being in conflict with his deposition testimony. It is for the jury to decide whether or not to believe Dr. Toms on his conclusion regarding survivability. *See Perales*, 39 S.W.3d at 170-71.

C.

The final matter we must address is the trial court's order allowing the defendants to conduct ex parte interviews of various treating physicians other than Dr. Toms and Dr. Bayles. There is absolutely no doubt that such an order is in violation of the law and cannot stand. In *Alsip v. Johnson City Medical Center*, No E2004-00831-COA-R9-CV, 2005 WL 1536192 (Tenn. Ct. App. E.S., filed June 30, 2005) we answered the question of whether a trial court had the authority to allow defense counsel by order to engage in ex parte dialogue with non-party treating physicians.[8] We held that *Givens v. Mullikin*, 75 S.W.3d 383 (Tenn. 2002) was a complete answer to the question and one that left the trial court with no authority to enter such an order. 2005 WL 1536192 at *10. Alternatively, we held that the order was a violation of federal law, even if not a violation of state law. *Id*. at *9. Our judgment in our *Alsip* opinion was expressly affirmed by the Supreme Court in the High Court's opinion in *Alsip v. Johnson City Medical Center*, 197 S.W.3d 722 (Tenn. 2006). If the trial court in *Alsip* was without authority to enter an order allowing ex parte communications with treating physicians, so was the trial court in this case.

---

[7] For example, if an expert witness in this case had said at one time, "the May 2000 images of the sinus show a cancerous tumor" and, at a later time, without explanation for the change, said "the May 2000 images of the sinus do not show a cancerous tumor," that would be an unequivocal conflict.

[8] In fairness to the trial court, we note that the trial court's order permitting ex parte communications with the Decedent's non-party treating physicians was entered prior to our June 30, 2005, decision in the *Alsip* case.

Both defendants argue that any error was harmless. On the other hand, the Plaintiff argues that the error requires reversal. Since we are reversing the summary judgment on the ground that the Plaintiff demonstrated a genuine issue of material fact on the challenged element of causation, there is no point in struggling over the concept of harmless error. We are inclined to believe that the error was "harmless" in the sense that it did not lead directly to the summary judgment, but not harmless in the sense of the general concerns that produced *Givens* and *Alsip*. Other than Dr. Barbara Murphy, who did furnish an affidavit that the Mitchell defendants filed in support of their motions for summary judgment, it is not clear to us who was interviewed and what they said. Dr. Murphy's affidavit was duplicative of Dr. Raefsky's testimony that we have held was enough to shift the burden to the Plaintiff. Dr. Daniel Starnes is another doctor the defendants interviewed, but they apparently abandoned plans to use him as an expert after our opinion in *Alsip* was released. We are also aware of a separate order specifically allowing Dr. Fordice to communicate with the lawyers who represented Dr. Mitchell and his group for the purpose of preparing for a deposition, but we do not interpret the Plaintiff's argument as challenging this particular order. We know of nothing in the record to show us, one way or another, whether the Plaintiff was somehow prejudiced by the order allowing the defendants to communicate with treating physicians. Obviously, in the proceedings on remand, there must be no further ex parte communications with non-party treating physicians. As to the particulars of whether the Plaintiff was somehow prejudiced by the erroneous order, and whether some relief may be in order based on communications that have already occurred, we think it better to leave that issue to the trial court on remand.

V.

The judgment of the trial court is vacated, as is the order allowing the defendants to conduct ex parte interviews of non-party treating physicians of the Decedent. Costs on appeal are taxed to K. James Schumacher, M.D., Associated Radiologists, P.C., Radiology Alliance, P.C., Stephen A. Mitchell, M.D., and Nashville Ear Nose & Throat Clinic. This case is remanded, pursuant to applicable law, for further proceedings.

_____
CHARLES D. SUSANO, JR., JUDGE