# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 25, 2016 Session

## DOROTHY HOLMES v. CHRIST COMMUNITY HEALTH SERVICES, INC., ET AL.

### Appeal from the Circuit Court for Shelby County
### No. CT-002855-12     James F. Russell, Judge

---

### No. W2016-00207-COA-R3-CV – Filed November 29, 2016

---

The plaintiff filed this action alleging medical malpractice against a physician who examined the plaintiff five days after injury to her shoulder, as well as the facility wherein the physician practiced. The plaintiff alleged, *inter alia*, that the defendant physician failed to properly diagnose a fracture dislocation in her shoulder, causing a delay in appropriate treatment. The plaintiff's subsequent treating physician opined in his deposition and via affidavit that if the plaintiff's injury had been diagnosed earlier, the plaintiff would likely have avoided an extensive surgical procedure, resultant infection stemming from such surgery, and residual impairment to her shoulder. The trial court excluded this testimony as speculative, granting summary judgment in favor of the defendant physician and hospital. The plaintiff has appealed. We determine that the trial court erred in excluding the causation evidence as speculative. We therefore vacate the court's grant of summary judgment in favor of the co-defendants.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Everett B. Gibson, Memphis, Tennessee, for the appellant, Dorothy Holmes.

Joseph M. Clark and Samantha E. Bennett, Memphis, Tennessee, for the appellees, Christ Community Health Services, Inc., and Bradley Carter, M.D.

**OPINION**

## I. Factual and Procedural Background

This medical malpractice[1] action arises from an incident that occurred on May 13, 2004, when the plaintiff, Dorothy Holmes, fell and injured her right shoulder. Ms. Holmes did not seek treatment for her injury until May 18, 2004, when she visited Christ Community Health Services, Inc. ("CCHS"), and was examined by Dr. Bradley Carter. According to Ms. Holmes, Dr. Carter examined her shoulder and diagnosed the cause of her pain as bursitis. Dr. Carter never ordered an x-ray of Ms. Holmes's shoulder. Instead, Dr. Carter sent Ms. Holmes home with a program of exercises.

When Ms. Holmes's shoulder pain worsened over time, she visited her chiropractor, Dr. Eric Novack, on June 15, 2004. Upon taking an x-ray of Ms. Holmes's shoulder, Dr. Novack referred Ms. Holmes to an orthopedic surgeon, Dr. Robert Bourland, who saw Ms. Holmes the following day. Dr. Bourland ordered a CT scan, which revealed a fracture dislocation in Ms. Holmes's shoulder. Dr. Bourland referred Ms. Holmes to Dr. Kenneth Weiss, an orthopedic surgeon specializing in shoulder injuries.

Upon examining Ms. Holmes on June 18, 2004, Dr. Weiss confirmed Dr. Bourland's diagnosis. Three days later, Dr. Weiss treated Ms. Holmes by performing open reduction surgery, during which he determined that Ms. Holmes's shoulder socket (glenoid) was so badly damaged that it had to be repaired utilizing a cadaver bone piece and surgical screws. Months following, after slow and incomplete healing, Dr. Weiss discovered severe infection in Ms. Holmes's shoulder joint. Consequently, Dr. Weiss performed irrigation and debridement surgery to "wash out" Ms. Holmes's shoulder joint and remove the surgical screws because of infection in the screw holes. A PICC line[2] was implanted so that antibiotics could be administered intravenously. Although Ms. Holmes's shoulder eventually healed, she suffered a partial physical impairment.

It is undisputed that Ms. Holmes originally filed a medical malpractice action in April 2005 against CCHS and Dr. Carter ("Defendants"). During the pendency of that

---

[1] In 2012, the Tennessee Legislature amended Tennessee Code Annotated sections 29-26-115 to -122 to replace each occurrence of the phrase, "medical malpractice," with "health care liability." *See Cunningham v. Williamson Cnty. Hosp. Dist.*, 405 S.W.3d 41, 44 (Tenn. 2013). Because the term "medical malpractice" was used in the statutes at the time of the accrual of this action, we will continue to use it throughout this opinion. *See, e.g., Cright v. Overly*, No. E2015-01215-COA-R3-CV, 2016 WL 6078563, at *8 (Tenn. Ct. App. Oct. 17, 2016).

[2] PICC is a common acronym for a peripherally inserted central catheter.

action, on November 28, 2006, Dr. Weiss executed an affidavit, wherein he stated:

> I do believe that an initial x-ray performed at the initial treatment would have given me more options for treatment than were available by the time I first saw her on June 15, 2004. I believe that I most likely could have treated her with a more typical operation as opposed to hav[ing] to use a bone block to her socket to obtain stability. I believe that this would have decreased the amount of permanent impairment to the right shoulder and could have even possibly eliminated the need for initial open treatment to her shoulder. She is left with a permanent impairment to the right upper extremity.

The original medical malpractice action was subsequently nonsuited and refiled in 2012. In 2015, Defendants deposed Dr. Weiss. During his deposition, Dr. Weiss explained that he had determined that Ms. Holmes suffered from a "chronic locked anterior shoulder fracture dislocation." Dr. Weiss also elucidated that because Ms. Holmes was a "month out" from her injury when he first examined her, he was required to perform an open reduction surgery to correct the fracture and put the shoulder back in place. Dr. Weiss opined that the surgery needed to be done as soon as possible in order to obtain the best result. In his notes from his initial examination, Dr. Weiss stated that he had discussed with Ms. Holmes that because her injury had occurred almost five weeks prior, the results would be "significantly tempered and that she would definitely not have an ideal result as if done acutely." Moreover, Dr. Weiss opined, "if he had taken care of it initially, we could have done . . . or may have gotten away without even surgery or definitely a lesser surgery than we would have to do at this point."

Dr. Weiss further articulated that upon performing surgery on Ms. Holmes's shoulder, he discovered that the ball of the shoulder joint manifested an indentation and that "basically half of the socket had been worn down." Dr. Weiss stated that because of this condition, he was constrained to perform a bone graft utilizing a piece of cadaver bone to reconstruct the socket. According to Dr. Weiss, Ms. Holmes's surgical procedure lasted a minimum of two hours but could have extended as long as three or four hours. Ms. Holmes subsequently visited Dr. Weiss for numerous post-surgery check-ups, during which Dr. Weiss noted that she sometimes experienced visible pain. Dr. Weiss testified that by October 25, 2005, Ms. Holmes had developed swelling in her shoulder and was experiencing drainage from her incision. Determining that she had developed an infection due to her surgery, Dr. Weiss prescribed antibiotics for Ms. Holmes in order to treat the condition.

Following the passage of several months with no response to the antibiotic treatment, Dr. Weiss performed another surgery on Ms. Holmes to clean the shoulder

3

joint.  Dr. Weiss described "obvious purulence" within the joint and found infection in the screw holes.  Dr. Weiss then removed the screws and washed out the shoulder joint and infected area.  According to Dr. Weiss, a PICC line was implanted so that Ms. Holmes could receive intravenous antibiotic treatment.  Ultimately, the infection was successfully treated, and Ms. Holmes's wound healed.  However, she experienced permanent impairment in her shoulder and arthritis due to the surgery and resultant infection.

Dr. Weiss opined that in a majority of such cases, if the type of injury Ms. Holmes had experienced were diagnosed shortly following the injury, surgery would not be required.  Dr. Weiss specifically testified that if Ms. Holmes had been "diagnosed acutely . . . immediately after the fall," her injury could have been treated with a closed reduction.  He continued to explain that "[e]ven if we catch it a little bit late, we could probably do a lesser operation than . . . we ended up having to do."  According to Dr. Weiss, a "lesser" operation would include arthroscopy, which results in an infection rate of "close to zero."  Dr. Weiss explained that the infection rate increases in relation to the length of the respective surgical procedure.

Dr. Weiss further noted that the wear of the glenoid rim in Ms. Holmes's shoulder was caused by the length of time the shoulder had been dislocated.  As he explained, because Ms. Holmes's shoulder had been "so long chronically locked," she had worn out the front part of the shoulder socket.  Upon cross-examination, Dr. Weiss stated that when Ms. Holmes fell, the impact of the humeral head hitting the glenoid caused the indentation on the humeral head, which was referred to as a Hill-Sachs fracture.  He determined that this impact occurred at the time of the shoulder dislocation.  Dr. Weiss indicated that if "we caught the diagnosis initially . . . we would hope she would not even necessarily have to have any surgery."  According to Dr. Weiss, although these types of injuries sometimes require open reduction, a majority of cases can be treated in closed fashion.

Dr. Weiss acknowledged that once a surgical site infection was recognized, it was prudent to attempt eradication of the infection as soon as possible because the infection could damage the joint.  He also acknowledged that by initially declining to treat the infection surgically, Ms. Holmes had contributed to the damage to her shoulder joint.  Dr. Weiss again opined, however, that if Ms. Holmes's injury had been detected earlier, "she could have been handled with easier care and . . . significantly less disability."  When questioned about what he meant by "detected earlier," Dr. Weiss explained that he was referring to "the original fracture."

Defendants subsequently filed a motion seeking to have Dr. Weiss's deposition testimony regarding causation excluded, arguing that his opinions were speculative.  The

trial court granted the motion and excluded Dr. Weiss's deposition testimony respecting causation. Defendants thereafter filed a motion for summary judgment, asserting that Ms. Holmes could not establish causation, an essential element of her claim. In response, Ms. Holmes filed the above-referenced 2006 affidavit of Dr. Weiss. The trial court granted summary judgment in favor of Defendants, stating:

> On September 21, 2015, the first day of trial in this matter, the Court heard argument on the Defendants' Motion to Preclude Testimony and Limit Damages. The Court granted the Defendants' motion and excluded the evidentiary deposition testimony of the Plaintiff's causation expert, Kenneth Weiss, M.D. The Court concluded that Dr. Weiss'[s] testimony did not establish that any act or omission on the part of Dr. Carter was the cause of the Plaintiff's initial surgery, the subsequent infection, or the second, corrective surgery to treat the infection. As memorialized in the Order Granting the Defendants' Motion to Preclude Testimony and Limit Damages, the Court held:

>> The terminology used by Dr. Weiss when offering causation opinions, specifically the terms "immediately," "acutely," "initially," "shortly," and "earlier," is not defined by Dr. Weiss. Because these terms are undefined and because the Plaintiff did not receive medical treatment from Dr. Carter for five (5) days after her fall, these terms may relate to the five (5) day period of time between the fall and treatment by Dr. Carter. Reasonable minds could do no more than speculate on the meaning of Dr. Weiss'[s] testimony, and the law does not permit speculative evidence to be considered by the trier of fact. Dr. Weiss'[s] opinion testimony does not satisfy the statutory causation element of Tenn. Code Ann. § 29-26-115, which requires the Plaintiff to establish that, more likely than not, some act or omission by Dr. Carter caused the Plaintiff to suffer an injury that would not have otherwise occurred.

> (Order Granting the Defendants' Motion to Preclude Testimony and Limit Damages, entered November 5, 2015, at p. 2).

> After excluding Dr. Weiss'[s] causation opinions, the Court excluded the remainder of Dr. Weiss'[s] testimony as irrelevant.

> On September 29, 2015, the Court entered an Order Granting Defendants' Motion to Preclude Testimony by Plaintiff's Expert, Dr.

Jeffrey May, on the Issue of Causation. Plaintiff's counsel did not consent to the Defendants' motion, but the Plaintiff did acknowledge that she did not intend to offer any expert medical witness proof at trial on the cause of the injury and related infection other than the evidentiary deposition of Kenneth Weiss, M.D., taken in this cause on August 20, 2015, which was previously excluded by the Court.

On September 29, 2015, the Defendants filed their Motion for Summary Judgment on the grounds that the Plaintiff could not establish causation, an essential element of her claim, and the Defendants were entitled to summary judgment as a matter of law. In response to the Motion for Summary Judgment, the Plaintiff filed the Affidavit of Everett Gibson, which attached an excerpt of the April 15, 2015 discovery deposition of Jeffrey May, M.D., and the November 28, 2006 Affidavit of Kenneth Weiss, M.D. The Court finds that the November 28, 2006 Affidavit of Kenneth Weiss, M.D., is superseded on all points raised therein by the August 20, 2015 evidentiary testimony of Dr. Weiss.

The same reasons that were articulated by the Court in excluding the deposition testimony of Dr. Weiss at the commencement of the trial of this case form the basis for the analysis for the motion for summary judgment. For the reasons set out in the above-quoted language from the Order Granting Defendants' Motion to Preclude Testimony and Limit Damages and the transcript of the September 21, 2015 hearing on the Motion to Preclude Testimony and Limit Damages, which is incorporated by reference into the Order, the Court rejects Dr. Weiss'[s] testimony and opinions for the purpose of opposing the Defendants' Motion for Summary Judgment. The Plaintiff still cannot prove the essential element of causation in this case, and the Defendants are entitled to summary judgment as a matter of law.

(Footnotes omitted.) Ms. Holmes timely appealed.

## II. Issues Presented

Ms. Holmes presents the following issues for our review, which we have restated slightly:

1.      Whether the trial court erred by granting summary judgment based on the absence of sufficient evidence establishing a genuine issue of material fact regarding causation.

6

2. Whether the trial court erred by excluding the testimony of Ms. Holmes's causation expert upon the finding that such testimony was speculative and insufficient to establish causation.

Defendants present the following additional issue:

3. Whether the trial court properly exercised its discretion when it assigned no weight to the affidavit of Ms. Holmes's expert that was offered in opposition to the motion for summary judgment.

## III. Standard of Review

The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)). As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250. As our Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

> [W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere

allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.* [*v. Zenith*], 475 U.S. [574,] 586, 106 S. Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65 (emphasis in original). Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014).

Furthermore, the "substance of evidence in affidavits submitted by the parties to support and to oppose a summary judgment motion must be admissible at trial." *Davis v. McGuigan*, 325 S.W.3d 149, 168 (Tenn. 2010) (citing Tenn. R. Civ. P. 56.06). As our Supreme Court has elucidated regarding such affidavits:

When issues have been raised regarding the compliance of affidavits with the standards prescribed by Tenn. R. Civ. P. 56 or the admissibility of evidence contained in these affidavits, the threshold issue of admissibility should be resolved before determining whether or not unresolved questions of fact exist. After these threshold questions have been addressed, the trial court may then determine whether, taking the strongest view of the admissible evidence in favor of the non-moving party, there remain any genuine issues of material fact to be decided at trial.

8

*Id.* (internal citations omitted). The Supreme Court also explained:

> Decisions regarding the admissibility of evidence are discretionary, and, therefore, the appellate courts review these decisions using the "abuse of discretion" standard. *Biscan v. Brown,* 160 S.W.3d 462, 468 (Tenn. 2005); *Mercer v. Vanderbilt Univ., Inc.,* 134 S.W.3d 121, 131 (Tenn. 2004). This standard applies to appellate review of decisions by a trial court when it is acting as a gatekeeper with regard to the admissibility of an expert witness's opinion testimony. Accordingly, the appellate courts review decisions regarding the qualifications, admissibility, relevancy, and competency of expert testimony using the abuse of discretion standard. *Brown v. Crown Equip. Corp.,* 181 S.W.3d 268, 273 (Tenn. 2005); *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 263-64 (Tenn. 1997). This standard of review should also be used at the summary judgment stage. *General Electric Co. v. Joiner,* 522 U.S. 136, 142-43, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997).

*Id*. at 168-69.

### IV. Exclusion of Dr. Weiss's Deposition Testimony

The trial court determined that Dr. Weiss's deposition testimony should be excluded upon a finding that it was speculative and therefore inadmissible. The court explained:

> [T]erminology used by Dr. Weiss when offering causation opinions, specifically the terms "immediately," "acutely," "initially," "shortly," and "earlier," is not defined by Dr. Weiss. Because these terms are undefined and because the Plaintiff did not receive medical treatment from Dr. Carter for five (5) days after her fall, these terms may relate to the five (5) day period of time between the fall and treatment by Dr. Carter. Reasonable minds could do no more than speculate on the meaning of Dr. Weiss'[s] testimony, and the law does not permit speculative evidence to be considered by the trier of fact.

Ms. Holmes argues that the meaning of Dr. Weiss's opinion testimony is clear: because her shoulder remained in an injured state for a period of weeks before being properly diagnosed and treated, a more extensive surgery was required, which resulted in a greater risk of infection and a greater level of impairment. Ms. Holmes asserts that when Dr. Weiss stated that "<u>if he had taken care of it initially</u>, we could have done no— or may have gotten away without even surgery or definitely a lesser surgery than we

would have to do at this point," there is no question that he was referring to Dr. Carter's initial examination and misdiagnosis (emphasis added).  Following our thorough review of Dr. Weiss's deposition testimony, we agree.

With regard to speculative evidence and causation in fact, our Supreme Court has explained:

> [W]e must decide whether Plaintiffs have proven that the Defendant's negligence caused "injuries which would not otherwise have occurred." T.C.A. § 29-26-115(a)(3).  As the Sixth Circuit recently noted in *Boburka v. Adcock,* 979 F.2d 424 (6th Cir. 1992), a plaintiff in a medical malpractice case in Tennessee must "prove that it is more likely than not that the defendant's negligence caused plaintiff to suffer injuries which would have not otherwise occurred."  *Id.* at 429.  In this regard, we reaffirm our observations made in *Lindsey* [*v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985)]:
>
> > The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result.  A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant . . . .
> >
> > > The plaintiff is not, however, required to prove the case beyond a reasonable doubt.  The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not . . . . (Citation omitted).  A doctor's testimony that a certain thing is possible is no evidence at all. His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a 'possible'

> cause of death. (Citation omitted). The mere possibility of a causal relationship, without more, is insufficient . . . .

> *Lindsey,* 689 S.W.2d at 861-62. Thus, proof of causation equating to a "possibility," a "might have," "may have," "could have," is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case. Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty. *White v. Methodist Hosp. South,* 844 S.W.2d 642, 648-49 (Tenn. App. 1992).

*Kilpatrick v. Bryant*, 868 S.W.2d 594, 601-02 (Tenn. 1993).

In the case at bar, Dr. Weiss testified unequivocally that Ms. Holmes's shoulder repair surgery would have been less extensive or probably even unnecessary had it not been for the delay in diagnosis. Dr. Weiss further testified that if the surgery required had been less extensive, the risk of infection would have been greatly reduced. He likewise opined that if open surgery had not been required, the risk of infection would have been almost eliminated. Dr. Weiss expressed all opinions within a reasonable degree of medical certainty.

Some specific examples of Dr. Weiss's deposition testimony include the following on direct examination:

> A.      The fact that we were five weeks out from her injury, if he had taken care of it <u>initially</u>, we could have done no—or may have gotten away without even surgery or definitely a lesser surgery than we would have to do at this point.

> * * *

> Q.      Is there any—do you have an opinion based upon a matter of—of probability shown to a reasonable degree of medical certainty as to the risk of infection for the type of surgery you described if done <u>acutely, shortly after the trauma</u>, as opposed to five weeks after the trauma as in Ms. Holmes' case?

> A.      Yes. You know, I think the—so from an arthroscopic procedure, the infection rate is not zero but close to zero. And then we know the infection

11

rate goes up by the length of the surgery. So if you could have done—we could have done a smaller open surgery. The infection rate, the longer the incision is open, the higher the infection rate.

Dr. Weiss additionally testified on cross examination:

Q.    Okay. So if she fell on May the 13th –

A.    Yeah.

Q.    -- you would expect that she would have surgery approximately ten days later?

A.    So ideally if we caught the diagnosis initially and the right thing, we would hope she would not even necessarily have to have any surgery.

\* \* \*

A.    Sure. I think that again unfortunately had this problem been detected <u>earlier</u>, I do feel that she could have been—she could have been handled with easier care and with significantly less—significantly less disability.

Q.    All right. And what could have been—what—what do you mean by if this had been detected earlier?

A.    The dislocation.

Q.    The—the original?

A.    The original dislocation.

Q.    The original fracture?

A.    Yeah, correct.

(Emphasis added.)

With regard to the purported "vagueness" in Dr. Weiss's testimony regarding time, this issue appears easily resolved by reading Dr. Weiss's statements comprehensively and in proper context. For example, Dr. Weiss's statement that "if he

had taken care of it initially," clearly refers to Dr. Carter and his examination of Ms. Holmes on May 18, 2004. There is no reasonable interpretation of this statement that could lead the reader to the conclusion that Dr. Weiss was referring to the timeframe before Dr. Carter examined Ms. Holmes, due to the use of the pronoun, "he." Although it is true that Dr. Weiss disclosed in his deposition that he was not initially aware that Ms. Holmes waited a few days before seeking treatment, the disclosure of this fact did not change his testimony.

We further note that Dr. Weiss's testimony was consistently couched in terms of "shortly after the trauma, as opposed to five weeks after the trauma" and detection of the problem "earlier." Dr. Weiss expressly stated that inasmuch as Ms. Holmes was a "month out" from her injury when he met with her, the treatment options were limited, necessitating a longer and more invasive surgical procedure. Dr. Weiss testified that even had Ms. Holmes's injury been diagnosed "a little bit late," he more than likely could have treated her with less invasive methods. Clearly, Dr. Weiss was aware that he was being asked to opine concerning whether the initial misdiagnosis by Dr. Carter had worsened Ms. Holmes's injury and resulted in more extensive medical problems. We determine that the trial court erred in ruling that Dr. Weiss's testimony was speculative and inadmissible simply because he did not expressly state that he was not referring to the time period during Ms. Holmes's five-day delay in seeking medical treatment. A review of Dr. Weiss's entire deposition leads to the conclusion that Dr. Weiss was referring not to the delay between Ms. Holmes's injury and her initial examination, but rather to the delay in diagnosis as a result of Dr. Carter's actions as a probable cause of Ms. Holmes's more extensive injury.

When read in proper context, Dr. Weiss's testimony constitutes "evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." *See Kilpatrick*, 868 S.W.2d at 601. Furthermore, Dr. Weiss's testimony is not couched in terms of mere possibility, but instead establishes his opinion of the probability, to a reasonable degree of medical certainty, that Ms. Holmes would not have required such extensive treatment or suffered such a significant injury and disability if her fracture dislocation had been diagnosed by Dr. Carter upon examination on May 18, 2004. *See id*. at 602. We therefore conclude that the trial court erred in determining that Dr. Weiss's deposition testimony regarding causation was too speculative to be admissible.

## V. Affidavit Evidence

Defendants argue that the trial court properly afforded no weight to Dr. Weiss's 2006 affidavit, filed in response to Defendants' motion for summary judgment, which stated in pertinent part:

I do believe that an initial x-ray performed at the initial treatment would have given me more options for treatment than were available by the time I first saw [Ms. Holmes] on June 15, 2004. I believe that I most likely could have treated her with a more typical operation as opposed to hav[ing] to use a bone block to her socket to obtain stability. I believe that this would have decreased the amount of permanent impairment to the right shoulder and could have even possibly eliminated the need for initial open treatment to her shoulder. She is left with a permanent impairment to the right upper extremity.

Although the trial court did not exclude the affidavit, the court ruled that the 2006 affidavit was "superseded on all points raised therein by the August 20, 2015 evidentiary testimony of Dr. Weiss."

Although Defendants raise various arguments in support of the trial court's refusal to consider this affidavit, none address the trial court's stated basis that the affidavit was "superseded" by Dr. Weiss's later testimony. Neither the trial court nor Defendants have provided authority for such a determination. In a similar circumstance when the trial court issued an exclusionary ruling, this Court explained:

> The first reason given for excluding the affidavit of Dr. Bayles was that he gave depositions after signing the affidavit. The court held that the depositions *therefore* superseded the affidavit. We disagree. We know of no rule of law or case holding that allows a court to ignore testimony given at one point in time for the sole reason that the same witness gave testimony at a later point in time. We do not believe this to be the law nor should it be.

*Jacobs v. Nashville Ear, Nose & Throat Clinic*, 338 S.W.3d 466, 479 (Tenn. Ct. App. 2010). We therefore conclude that the trial court erred in ruling that Dr. Weiss's affidavit was superseded by his deposition testimony and therefore should not be considered.

VI. Summary Judgment

Ms. Holmes ultimately argues that the trial court erred by granting summary judgment to Defendants based on a lack of causation evidence because Dr. Weiss's deposition testimony and affidavit were improperly excluded/not considered. We agree. Dr. Weiss's testimony presents a genuine issue of material fact concerning causation that would preclude a grant of summary judgment in favor of Defendants.

14

As our Supreme Court has explained regarding summary judgment proceedings, "summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial." *Rye*, 477 S.W.3d at 264-65 (emphasis in original) (quoting Tenn. R. Civ. P. 56.04, 56.06). Furthermore, with regard to evidentiary questions and summary judgment, the Court has elucidated:

> [T]he threshold issue of admissibility should be resolved before determining whether or not unresolved questions of fact exist. After these threshold questions have been addressed, the trial court may then determine whether, taking the strongest view of the admissible evidence in favor of the non-moving party, there remain any genuine issues of material fact to be decided at trial.

*See Davis*, 325 S.W.3d at 168.

Having concluded that the trial court erred in excluding and failing to consider respectively the deposition testimony and affidavit of Dr. Weiss regarding causation, this Court must then review that evidence by taking the strongest view of it in favor of Ms. Holmes. In doing so, we conclude that the causation evidence presented by Dr. Weiss created a genuine issue of material fact regarding causation that must be determined at trial. Viewing the evidence in the light most favorable to Ms. Holmes, Dr. Weiss opined that it was probable that the delay in diagnosis was a cause of the additional injury to Ms. Holmes's shoulder and a cause of the extensive treatment she had to endure. Dr. Weiss also unequivocally opined that the failure to discover the fracture dislocation and delay in treatment contributed to Ms. Holmes's overall shoulder joint impairment. Dr. Weiss's testimonial evidence and affidavit evidence therefore establish a genuine issue of material fact for trial regarding causation. We conclude that the trial court erroneously granted summary judgment in favor of the Defendants when admissible causation evidence was proffered, thereby warranting a trial. We therefore vacate the trial court's grant of summary judgment.

## VII. Conclusion

For the foregoing reasons, we reverse the trial court's decisions to exclude the deposition testimony of Dr. Weiss and to not consider Dr. Weiss's 2006 affidavit. Therefore, we must vacate the court's grant of summary judgment to Defendants and remand this matter to the trial court for further proceedings. Costs on appeal are assessed equally to the appellees, Christ Community Health Services, Inc., and Dr. Bradley Carter.

15

_____
THOMAS R. FRIERSON, II, JUDGE