FILED
06/11/2024
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 9, 2024 Session

**MATTHEW OOTEN v. JASON BARIL**

**Appeal from the Chancery Court for Knox County**
No. 198457-3        Christopher D. Heagerty, Jr., Chancellor

————————————————————

**No. E2022-01673-COA-R3-CV**

————————————————————

The plaintiff, a founding member of a law firm, filed this action against other members. The trial court found that the defendant members violated their duty of good faith and fair dealing, breached their contract with the plaintiff, violated their fiduciary duty toward the plaintiff, engaged in a conspiracy, and committed conversion. We affirm the ruling of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

Richard D. Underwood, Memphis, Tennessee, for the appellant, Jason K. Baril.

Samuel C. Doak, Jay W. Mader, and Paul E. Wehmeier, Knoxville, Tennessee, for the appellee, Matthew D. Ooten.

**OPINION**

**I. BACKGROUND**

This appeal arises from disagreement over the management of a new law firm. Matthew Ooten, Linda Betz, and Jason Baril, attorneys licensed to practice law in Tennessee, previously worked together at the Knoxville law firm of Ogle, Elrod and Baril ("OEB") until they left OEB to start a new law firm, a separate disability practice, a supporting call center, and a holding company. They are the founding members of Ooten Betz & Baril, PLLC ("OBB"); Disability Advantage Group, LLC ("DAG"); Summit

Conversions, LLC ("SC"); and Summit Partners, LLC ("SP") (collectively the "LLCs"). OBB, DAG, SC, and SP were formed as limited liability companies through the Tennessee Secretary of State on December 1, 2018, with delayed effective dates: DAG, December 14, 2018; SP, SC, and OBB, January 1, 2019. Each LLC is member managed. Of these four entities, only OBB is a law firm.

Ooten began working at OEB around 2011, during his first year of law school. Once he received his degree, Ooten managed the disability practice at OEB. He was joined in 2014 by Cassie Freers, who Ooten trained on the case management system/process used by OEB. Katie Cozart joined OEB as a case manager in July 2015, and was promoted to case manager supervisor in April 2016. She reported directly to Freers. Ooten oversaw the development of the case management system at OEB, which took approximately three years to construct and was a constant work in progress. It was built on a software platform, and Ooten, along with Freers and Cozart, created 30 to 40 custom task packages necessary to manage disability claims. The system allowed for efficient management of a large volume of disability cases.

The disability group that Ooten managed at OEB was very profitable, growing from essentially nothing in 2014 to roughly $1.6 million in 2018. Around this time, Baril approached Ooten about leaving OEB with him. Ooten understood that the entire disability practice would be moving from OEB. He thereafter approached Freers and Cozart, his team at OEB, about leaving to start the new venture with Betz and Baril.

Betz, Baril, and Ooten executed four separate documents titled "Partnership Agreements" referencing the LLCs. For the first three years of DAG's operation, its assets were to be owned, and property was to be divided, on the following percentages of ownership: (a) Baril: 39 percent; (b) Betz: 29 percent; (c) Ooten: 29 percent; and (d) Freers: 3 percent. Baril was to receive an additional nine percent ownership interest in DAG for three years because of his capital contribution of all the disability cases he received in the split from OEB. Any fees related to those cases traveled with him. Baril testified that "[a] thousand of the cases were already finished and then we had another about 5500 disability cases that went in so the 6500 total." DAG was required to distribute its net profits to Betz, Baril, and Ooten pursuant to their respective percentage interests–i.e., 39 percent, 29 percent, and 29 percent during the first three years of operation.

DAG, with 40 to 50 employees,[1] like OEB, had a high volume of disability cases. Leads about possible clients were downloaded into the case management system, which, with its automated tasks, guided the cases along through the levels of the Social Security process. As Ooten had largely implemented the case management system for disability claims at OEB, it was fine-tuned once at DAG and OBB, with Ooten, Freers, and Cozart rebuilding 50-60 reports. Ooten further made decisions about whether to keep leads going,

---

[1] The call center had 10 to 14 employees. About 11 people worked at OBB.

auditing files, and managing stricter intake requirements to ensure better quality cases. He also designed and implemented a critical telephone system used by DAG to convert leads into clients. Someone from SC, the call center, would contact the potential client and go through qualification questions to see if the individual met the requirements for eligibility for Social Security; if so, the person was sent a retainer agreement. SC was utilized to contact the leads, set and follow up on retainers, and file initial applications. Ooten argues his expertise and the systems he implemented are valuable intellectual property key to the success and value of the LLCs.

Betz, who had managed the personal injury practice at OEB, was tasked with implementing the personal injury case management system for OBB. According to Ooten, however, Betz failed to make the personal injury system operationally sound and opposed his efforts to assist her. He claims that she became increasingly hostile, aggressive, and combative toward him when he suggested improvements. Ooten contends that he made good faith efforts to avoid conflict with her by outlining how the ownership of the LLCs could be restructured among the members to avoid interaction between Betz and Ooten.

Betz testified that she first became aware that Ooten opposed working with her "when he came into my office one morning and told me that he was done working with me, leave his staff alone, do not talk to them, and that he would work out everything with Jason and that he was finished talking with me." She related that it was her understanding "he then communicated with Jason that he … was not going to work with me anymore and he wanted to dissolve the entities as they were currently structured, and if Jason wouldn't agree to that, he was done and he would have to do something else." Baril asserted that Ooten made it clear to him that he was not going to work with Betz at OBB. According to Baril, Ooten's suggested redistribution of ownership interests was unfair to Betz and unworkable.

On March 20, 2019, Ooten and Baril were scheduled to go to Las Vegas for the NCAA basketball tournament. That morning, however, Baril texted Freers to ask if she wanted to meet for lunch at Calhoun's, a Knoxville restaurant. Freers met with Betz and Baril for lunch, at which time Baril inquired if she would stay at DAG and assume the disability practice responsibilities if Ooten departed the firm. Freers informed them that she and Ooten were not a package deal; she would make a decision that was best for her and her family. She indicated, nonetheless, that she hoped things would work out. They discussed a raise if Freers assumed Ooten's responsibilities. Freers mentioned that Cozart was a vital member of DAG's leadership team and that she would like to see her remain with the firm. Betz and Baril subsequently invited Cozart as well as Freers to a second meeting. Cozart testified that Betz and Baril informed her that they were planning to meet with Ooten because the members were not all getting along and that Ooten would not be working there anymore. Betz and Baril expressed to Cozart their belief that she was a valuable employee at DAG and their desire for her to stay. As with Freers, an increase in Cozart's salary was addressed. According to Cozart, she was to make close to six figures

when the proposed profit sharing was included. As to Ooten, instead of meeting up with him in Las Vegas as planned, Baril texted him on March 21, 2019, at 10:48 a.m., stating "Dude I ate a big ass weed brownie and just woke up I think so I missed my flight[.] I'll call you in a couple of hours to talk[.]"

Baril directed his attorney to advise Ooten by letter that the computer passwords and the locks on the doors had been changed at OBB, he had been removed from all partnership bank accounts, and that if he came around the physical premises, law enforcement would be notified. Upon Baril approving the letter, it was hand-delivered to Ooten on April 2, 2019. The letter outlined that if Ooten chose to litigate and/or request a formal market valuation of his vested partnership interest, Betz and Baril, pursuant to the Partnership Agreements, would hold a meeting and vote their majority interest to choose an appraiser to set the market value for the entities.

Two days after Ooten received the letter, the record reflects that Betz and Baril began making draws and distributions from DAG based on a 70/30 split—i.e., 70 percent to Baril and 30 percent to Betz, diminishing Ooten's interest in the entities to zero. In July 2019, Betz filed for divorce, and she and Baril formally announced that they were a couple to firm personnel. Ooten opines that it can be reasonably inferred that the relationship existed before he was shutout on April 2, 2019.

Upon Ooten's departure, Freers' salary increased from $55,000 to $115,000, and Cozart's salary increased from the low $40,000s to approximately $93,000. Freers took over most of Ooten's role, and Cozart stepped into Freers' shoes. Initially, Freers was granted access to Ooten's emails in order for her to utilize Ooten's vendor contacts and services as well as to see whether any matters needed to be addressed. Around December 2019, however, she no longer had access to Ooten's account. Upon notifying Betz and Baril that the account had become unavailable to her, she was advised to ask them if she needed something.

According to Freers and Cozart, as the situation progressed, they were unable to manage DAG as it had run under Ooten. They related that neither the proper tools nor authority to be successful was given to them, and they did not receive timely responses to questions regarding matters which Ooten had instinctively addressed. Despite Freers and Cozart doing what they could, the pair claim that there was little to no communication with Baril for the majority of 2020 and 2021. They observed that Ooten's absence negatively impacted DAG.

As shown by the 2019 K-1 for each LLC, Baril transferred Ooten's ownership interest in DAG, OBB, and SC to himself. His share in DAG increased from 39 percent to 68 percent, with the additional 29 percent received by him being Ooten's percentage interest. The record reveals that personal travel and entertainment expenses were charged to either DAG and/or OBB, including $17,566 in 2019; $10,353 over eight months of 2020;

and $6,823 over seven months in 2021. The firm name was changed to Betz and Baril without consultation with Ooten. No distributions were set aside for Ooten.

According to testimony and evidence of record, from January 1, 2019, to July 31, 2021, Betz received $429,500 in guaranteed payments and $10,986 in equity distributions from DAG and $73,133 in equity distributions from OBB. From July 31, 2021, to present [January 27, 2022], she received approximately $10,000 to $20,000 a month in draws from DAG. Betz testified that she "deferred to Jason as far as how we did our distributions…." She acknowledged that DAG was profitable and was generating cashflow from the beginning. From January 1, 2019, to July 31, 2021, Baril received $874,900 in guaranteed payments and $379,018 in equity distributions from DAG, $61,500 in guaranteed payments and $25,000 in equity distributions from SC, as well as $129,207 in equity distributions from OBB. From August 2021 through December 2021, Baril estimated receiving $20,000 a month in guaranteed payments from DAG.

On July 23, 2019, Ooten, individually and on behalf of DAG, filed this action against Betz and Baril for breach of fiduciary duties, breach of the obligation of good faith and fair dealing, breach of contract, intentional interference with business relationships, civil conspiracy, accounting (derivatively against Baril only), and conversion. Ooten argued that by their letter of April 2, 2019, Betz and Baril shut him out and deprived him of his meaningful return on his membership in the LLCs—namely, employment as a member with draws, distributions, and benefits, as well as the ability to participate in the operation of each LLC to increase their value and, in turn, to grow the value of his membership interest. Ooten asserted that he has not withdrawn or otherwise terminated his membership interests in the LLCs and is entitled to the same draws, distributions, and benefits enjoyed by Betz and Baril.

Pursuant to a September 23, 2019 agreed order, among other things, Betz and Baril were required by the trial court to pay Ooten $50,000 in two installment payments and prohibited from voluntarily canceling, modifying, or allowing the lapse (for nonpayment) of any insurance policy providing coverage to Ooten and his spouse. Betz and Baril, per the terms of the agreed order, were provided a $50,000 credit against any settlement or verdict in favor of Ooten. During the course of the litigation, much discord arose relating to discovery. Ultimately, on November 15, 2021, pursuant to Rule 37.02(a) of the Tennessee Rules of Civil Procedure, the court entered a sanctions order of default against Betz and Baril for wrongfully terminating Ooten's interest on April 2, 2019.

The trial in this matter was held January 26 through January 28, 2022. Ooten's expert witness, Michael Harvey, a business appraiser, determined that as of July 31, 2021, the total fair value of Ooten's interest in DAG, OBB, and SC equaled $523,000: (1) DAG: $435,000; (2) OBB: $50,000; and (3) SC: $38,000. Harvey also concluded that the missing guaranteed payments owed to Ooten from DAG, as of July 31, 2021 (after deducting $67,000 already paid to Ooten) equaled $330,706, and the missing guaranteed payments

from SC equaled $18,450. Harvey asserted that as of July 31, 2021, the missing equity distributions owed to Ooten from DAG, OBB, and SC equaled $185,767 (after deducting $10,000 already paid). Accordingly, Ooten's total missing guaranteed payments and equity distributions as of July 31, 2019, equaled $534,923. The total of Ooten's fair value interest in DAG, OBB, and SC; missing guaranteed payments from DAG and SC; and equity distributions from DAG, OBB, and SC, as of July 31, 2021, was asserted to equal $1,057,923.

Findings of Fact and Conclusions of Law, along with an order, were issued on October 24, 2022. The trial court made, *inter alia*, the following findings:

> By Order of this Court it has been designated that Betz and Baril "shutout" Ooten from the rightful participation in the business of the LLCs in question. A member's duty of care to a member-managed LLC, and the members thereof, such as those in question here, "is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct or knowing violation of the law." T.C.A. § 48-249-403(c).
>
> Here, Betz and Baril knowingly violated their duty to Ooten by intentionally withholding payments due him under the Partnership Agreements for all of the associated LLCs. Tennessee Code Annotated § 48-249-403(b)(1) requires a member of a member-managed LLC: "To account to the LLC and to hold as trustee for it any property, profit or benefit derived by the member in the conduct … of the LLC's business, or derived from the use by the member of the LLC's property, including the appropriation of any opportunity of the LLC[.]" … In addition to shutting him out of the LLCs, Betz and Baril failed to make guaranteed payments due Ooten, and effectively curtailed his then present ability to practice law in the form and/or fashion which he had been practicing since earning his law license. These actions also constitute a breach of their duty to Ooten of "good faith and fair dealing."
>
> * * *
>
> By failing to disburse funds to Ooten which represented monies due him under … each partnership agreement, Betz and Baril effectively breached their contract with Ooten. The contracts were also breached by the failure of Betz and Baril to observe the provisions of each of the agreements which dealt with "termination of [a] partner's interest." The breaches of the contracts by Betz and Baril are material, in that they are not slight or minor, but are substantial and go to the primary purpose of the agreement between the parties….

- 6 -

… By violating their fiduciary duty to Plaintiff by withholding distributions from him under the terms of the Partnership Agreements, Defendants deprived Plaintiff of his rightful property and/or funds. These actions constitute a conversion under the law for which Plaintiff is entitled to compensation….

* * *

… Ooten has proven the breach of the fiduciary duty between himself and the other members of the associated LLCs. This breach of fiduciary duty was brought about by the withholding, by Betz and Baril, of distributions due to Ooten under the Partnership Agreements…. As a result of Ooten being "shut out" of the Partnerships by Betz and Baril, and the subsequent failure on behalf of Betz and Baril to observe their duty of loyalty under the Partnership Agreements and Tennessee Code Annotated section 48-249-403(b)(1), Ooten has been damaged to the extent of his failure to receive the funds due to him under the Partnership Agreements. These actions constitute a civil conspiracy under the law for which Plaintiff is entitled to compensation….

(internal citations omitted). Dismissed were claims for punitive damages, intentional interference with business relationships, and a derivative action by Ooten on behalf of DAG. The trial court ordered that Ooten should recover from Betz and Baril, jointly and severally, the amount of $897,913 plus prejudgment and post-judgment interest at the maximum rate allowed by law and reasonable and necessary attorney fees. On January 10, 2023, the court further awarded Ooten discretionary costs pursuant to Rule 54.04 of the Tennessee Rules of Civil Procedure in the amount of $12,039.05. Additionally, on February 28, 2023, the court awarded Ooten attorney fees in the amount of $255,892.50 and expenses (not otherwise recoverable as discretionary costs) in the amount of $28,610.41.

Betz and Baril filed separate notices of appeal on November 23, 2022. This court dismissed Betz's appeal on February 23, 2023, for failure to comply with Rule 24 of the Tennessee Rules of Appellate Procedure and for failure to comply with orders of the court.

## II. ISSUES

The issues raised by Baril are restated as follows:

A. Whether the trial court correctly determined the fair value of Ooten's interest in the LLCs?

B. Whether the trial court abused its discretion by permitting testimony from Ooten's expert witness?

C. Whether Baril abandoned his oral motion to amend his answer to add the affirmative defense of setoff, and, if not, whether it would have been in the trial court's discretion to deny the motion?

## III. STANDARD OF REVIEW

Our review of the trial court's factual findings in this bench trial is "de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *Raley v. Brinkman*, 621 S.W.3d 208, 227 (Tenn. Ct. App. 2020) (citing *Kelley v. Kelley*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing Tenn. R. App. P. 13(d)). Evidence preponderates against a finding of fact by the trial court if it supports "another finding of fact with greater convincing effect." *Raley*, 621 S.W.3d at 227 (citing *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 599 (Tenn. Ct. App. 2006) (citations omitted)). Review of the trial court's conclusions of law also is de novo but without a presumption of correctness. *Raley*, 621 S.W.3d at 227-228 (citing *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011)).

We give great deference to the trial court's credibility assessments. *See Watson v. Watson*, 309 S.W.3d 483, 490 (Tenn. Ct. App. 2009). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). "A trial court's decision to admit or exclude evidence is within the trial court's discretion, and we review decisions regarding the admissibility of evidence under an abuse of discretion standard." *Raley*, 621 S.W.3d at 235 (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999) (citing *Seffernick v. Saint Thomas Hosp.*, 969 S.W.2d 391, 393 (Tenn. 1998); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992)).

## IV. DISCUSSION

### A.

Baril argues the trial court erred in awarding Ooten fair value damages which were not tied to the date of termination of Ooten's membership interests or the date of breach. He asserts that Ooten was no longer a member after April 2, 2019. Ooten contends that the date of the breach is continuous. According to Ooten, every time Betz and Baril failed to pay him what he is owed, they breached the contract and their fiduciary duties once again.

Tennessee Code Annotated section 48-249-403(b)(1) imposes a duty of loyalty, subpart (c) imposes a duty of care, and subpart (d) the obligation of good faith and fair dealing. The duty of care requires a member to refrain "from engaging in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of the law[,]" and the

duty of loyalty requires a member, in pertinent part, "[t]o account to the LLC and to hold as trustee for it any property, profit or benefit derived by the member in the conduct or winding up of the LLC's business, or derived from a use by the member of the LLC's property, including the appropriation of any opportunity of the LLC." Tenn. Code Ann. § 48-249-403(b)(1) and (c). The obligation of good faith and fair dealing requires a member to "discharge the member's duties to a member-managed LLC and its other members . . . [and] exercise any rights with respect to the LLC consistently with the obligation of good faith and fair dealing." Tenn. Code Ann. § 48-249-403(d).

Upon finding that the actions of Betz and Baril violated Tennessee Code Annotated section 48-249-403(b)(1), (c), and (d), the trial court cited the discretion given to it by section 48-249-805, which provides as follows:

> If an LLC, or any officer, manager, director or member, as applicable, of the LLC, or other person with the authority to act for the LLC, violates a provision of this chapter, a court in this state may, in a proceeding brought by a member or holder of financial rights of the LLC, grant any equitable relief it considers just and reasonable in the circumstances, and, award expenses, including attorneys' fees and disbursements, to the member or holder of financial rights, as applicable.

The trial court made a cumulative award of damages "under all of the viable theories" available to Ooten: breach of statutory fiduciary duties (duty of care, good faith and fair dealing, and duty of loyalty), breach of contract, conversion, and conspiracy. It used the equitable powers granted by the Tennessee Revised Limited Liability Company Act ("TRLLCA"), Tennessee Code Annotated section 48-249-101, *et seq.*, and common law. The trial court found that Betz and Baril did not have the legal ability to terminate Ooten's membership interests pursuant to TRLLCA. *See, e.g.*, Tenn. Code Ann. § 48-249-503. The Partnership Agreements did not grant them the right or power to terminate Ooten's interests. Article 13 of the DAG Partnership Agreement only allows for termination if there is a withdrawal or retirement upon 60 days' written notice, disability, or death. No provision for expulsion of a member is outlined. The terms of the other Partnership Agreements are roughly the same as the DAG Partnership Agreement, except for ownership percentages. By shutting out Ooten from the LLCs and continuing to withhold distributions and guaranteed payments owed to him for over two years, Betz and Baril committed ongoing and continuing violations of their fiduciary duties, continued to convert distributions and guaranteed payments, and committed ongoing and continuing breaches of their obligations under the Partnership Agreements through the date of trial. Nor did the April 2, 2019 letter terminate Ooten's membership interests; at best, the letter worked to notify Ooten that the computer passwords and the locks on the doors had been changed; he had been removed from all "partnership" bank accounts; and that if he came around the physical premises, Betz and Baril would call the police. The court determined that "Ooten has not withdrawn or otherwise terminated his membership interests in the

LLCs and is entitled to the same draws, distributions, and benefits enjoyed by Betz and Baril, including access to client files and to the physical and electronic premises of the LLCs." These designated facts foreclose Baril's argument that Ooten's interests terminated on April 2, 2019, because they establish, for the purposes of this case, pursuant to Rule 37.02(A)[2] of the Tennessee Rules of Civil Procedure, that Ooten remained a member.

The trial court correctly determined the damages for Ooten's missed guaranteed payments, equity distributions, and a reduced fair value of his equity membership interests. These damages, based on violation of the statutory fiduciary duties by Betz and Baril, as well as their conspiracy, conversion, and breach of the Partnership Agreements are "just and reasonabl[y]" related to the harm suffered by Ooten. Tenn. Code Ann. § 48-249-805. The trial court possessed the equitable powers of Tennessee Code Annotated section 48-249-805 to "grant any equitable relief it consider[ed] just and reasonable [under] the circumstances. . .[.]" *See Raley*, 621 S.W.3d at 247. Any "uncertainties in awarding" these damages to Ooten must be resolved against Betz and Baril. The trial court's determination of the fair value interest as of the date of its judgment is affirmed. *See Raley*, 621 S.W.3d at 218, 221, 225.

**B.**

Baril argues that the trial court "erred in allowing [Ooten's] expert to testify regarding the Fair Value of a law practice." Baril asserts Harvey: (i) lacked experience valuing law practices as part of litigation, (ii) had not authored books or articles specifically on law practice valuation, and (iii) lacked knowledge of Tennessee Supreme Court Rule 8, 1.17 regarding the obligation of attorneys arising from the sale of a law practice. He suggests that Harvey should have considered Tennessee Supreme Court Rule 8's requirements for the sale of law practices as part of his "fair value" analysis, and the failure to do so makes his "fair value" opinions invalid.

Rule 1.17 of the Tennessee Rules of Professional Responsibility has no application to the valuation of the fair value of Ooten's interest in DAG, OBB, and SC. Indeed, the Rule's comments state:

> [13] This Rule applies to the sale of a law practice by representatives of a deceased, disabled or disappeared lawyer. Thus, the seller may be

---

[2] If a deponent; party; an officer, director, or managing agent of a party; or, a person designated under Rule 30.02(6) or 31.01 to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under Rule 37.01 or Rule 35, or if a party fails to obey an order entered under Rule 26.06, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order[.]

represented by a non-lawyer representative not subject to these Rules. Since, however, no lawyer may participate in a sale of a law practice which does not conform to the requirements of this Rule, the representatives of the seller as well as the purchasing lawyer can be expected to see to it that they are met.

[14] Admission to or retirement from a law partnership or professional association, retirement plans and similar arrangements, and a sale of tangible assets of a law practice do not constitute a sale or purchase governed by this Rule.

[15] This Rule does not apply to the transfers of legal representation between lawyers when such transfers are unrelated to the sale of a practice or an area of practice. This Rule also does not apply to mergers between firms.

Ooten was not selling his disability practice in an arm's length transaction and leaving the industry—a requirement of Rule 1.17. The disability practice was continued as a going concern without interruption. Further, only one entity involved in this matter was a law firm, OBB. Rule 1.17 would have no application to the other three non-law firm entities.

"In general, . . . the admissibility, qualifications, relevancy, and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp.*, 955 S.W.2d 257, 264 (Tenn. 1997). In determining whether evidence is valid and reliable, and will provide substantial assistance to the trier of fact, a court should review: "(1) whether the scientific evidence has been tested and the methodology with which it has been tested; (2) . . . has been subject to peer review or publication; (3) . . . a potential error rate is known; (4) . . . the evidence is generally accepted in the scientific community; and (5) whether an expert's research in the field has been conducted independent of litigation." *Id.*, 955 S.W.2d at 265. The factors are not exclusive. *Dubois v. Haykal*, 165 S.W.3d 634 (Tenn. Ct. App. 2004). It is appropriate for the court to evaluate the criteria and methodology; it has the discretion to accept or reject. It is recognized that the *McDaniel* factors "are not mandated in every case in which expert evidence is offered and should not be applied unless the factor or factors provide a reasonable measure of the expert's methodology." *Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 272 (Tenn. 2005). In a case such as this involving valuation, the trial court must only be satisfied that the techniques and methods used by the expert "are generally considered acceptable in the financial community." *Buckley v. Carlock*, 652 S.W.3d 432, 442 (Tenn. Ct. App. 2022).

Tennessee Code Annotated section 48-249-505(c) provides:

(c) … If the existence and business of the LLC are continued following the

termination of a membership interest … regardless whether such termination of membership interest was wrongful, any member whose membership interest has so terminated … is entitled … to receive from the LLC the fair value of the terminated membership interest as of the date of termination of such membership interest ….

Determining a company's fair value "is generally left to the discretion of the courts." *Athlon Sports Commc'n, Inc. v. Duggan*, 549 S.W.3d 107, 120 (Tenn. 2018). The court's discretion should only be disturbed where "it (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). "A court's decision [on "fair value"] need only be 'within the range of acceptable alternative dispositions.'" *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305 (Tenn. 2020). "Fair value" may be proven "'by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court.'" *Athlon Sports Commc'n, Inc.*, 549 S.W.3d 107 at 126.

Harvey demonstrated that he was qualified to testify about the "fair value" of law practices and his opinions were generally accepted in the financial community. His testimony established that he has degrees in accounting and business administration. He is a certified public accountant and accredited in business valuation. Harvey has conducted more than 1,000 business valuations since approximately 1999 and has experience as a broker applying the appropriate valuation approaches to businesses. Harvey observed that he had valued approximately five law practices, the last being three or four years prior to the January 2022 trial.

In evaluating the fair value of the entities in this case, Harvey relied on DealSTATs, a statistical database whose underlying data is collected from business brokers, accountants, and consultant surveys of business sale transactions. In his analysis, Harvey narrowed the business sales data to law firms sold since 2000 with revenue between zero and 2.5 million. He considered 18 law firm sale transactions for his opinion, including one disability practice. Harvey's methodology was sound, and he demonstrated his understanding of the relevant approaches to valuation before utilizing his training, experience, and expertise to determine the fair value. No evidence was offered undermining the reliability or truthfulness of the data used by Harvey or the mathematical result he calculated. The trial court appropriately exercised its discretion after careful examination of Harvey's testimony.

## C.

After the parties' presentation of evidence, counsel for Baril moved to amend pursuant to Rule 15.02 of the Tennessee Rules of Civil Procedure to conform the defense's pleadings with the proof presented at trial. When the trial court inquired as to what it was

being asked to do, Baril's counsel stated:

> MR. UNDERWOOD: Conform the defense pleadings to the proof that was offered without objection regarding the fact that a $50,000 payment was made to Mr. Ooten that in the order itself he's entitled to a setoff, but I just need the Court to recognize that.
>
> THE COURT: That was an agreement between the parties.
>
> MR. MADER: We don't dispute they get a credit for the 50-. I mean, that's in the signed order by Mr. Capps, by me, and by Chancellor Moyers.
>
> THE COURT: There's not going to be any – there's no need to amend because that's already part of the case. It's the law of the case.
>
> MR. UNDERWOOD: And also in regard to the payroll that he had received, and I don't know what the Court's ultimate determination of what the cutoff date would be, but he received payroll in 2019.
>
> THE COURT: I understand, I wrote that number down.
>
> MR. UNDERWOOD: Okay.
>
> THE COURT: And it's sitting right here.
>
> MR. UNDERWOOD: All right. And the bonuses. Have you got those?
>
> * * *
>
> THE COURT: It's part of the same document.
>
> MR. UNDERWOOD: All right. Thank you, Judge. That's all I've got on that then.

Baril further seeks to claim as a setoff $42,000 paid to Ooten for payroll and bonuses received in 2019. Baril's counsel also contends that insurance coverage and a phone were provided for Ooten but that the trial court did not set off those amounts. Accordingly, Baril argues that the matter should be remanded for a determination of the total amount of setoff to which he was entitled. He thus asserts the trial court erred by denying his motion to amend his answer to add the affirmative defense of setoff. Ooten contends that Baril abandoned the motion.

Ooten does not dispute Betz and Baril are entitled to a credit of $50,000 as agreed

by the parties in the September 23, 2019 Agreed Order. Ooten argues, however, that the trial court correctly observed there was no need to amend because it was already part of the case. Similarly, as to the insurance coverage and phone costs, the court questioned Betz's counsel as follows:

> THE COURT: Are these monies that were paid out under the agreed order? Right? These are monies that are paid out under the agreed order?
>
> MR. CAPPS: These would be, yes.
>
> THE COURT: Then what relevance does it have to what we're talking about?

Further, the calculations of Harvey regarding guaranteed payments and equitable distributions, which the trial court awarded to Ooten unchanged, subtracted amounts already paid to Ooten—*i.e.*, $67,000 from the guaranteed payments and $10,000 from the equitable distributions owed to him.

The record before us reveals that Baril waited for over two years to make an oral motion to amend at trial. As observed by Ooten, "a party waives an affirmative defense if it does not include the defense in an answer or responsive pleading." *Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 735 (Tenn. 2013) (citations omitted). Undue delay is a basis to deny the motion. Further, Baril's motion to amend would be futile, as the September 23, 2019 Agreed Order (signed by counsel for the parties and the trial court) required, *inter alia*, that the $50,000 to be credited to any judgment, and Harvey's calculations of guaranteed payments and equity distributions were relied on by the trial court unchanged. Additionally, the payroll and bonuses were received by Ooten for work done for DAG prior to the shutout. Therefore, these amounts are not properly part of the calculation of damages.

Another reason the motion to amend would be futile is the fact that the claimed setoffs require "that the demands be mutual and subsisting between the same parties and that the demands be of the same grade and nature or be due in the same capacity or right." *Raible v. Graham*, No. 03A01-9112-CV-434, 1992 WL 91514, at *2 (Tenn. Ct. App. May 6, 1992) (quoting *Auton's Fine Jewelry v. Beckner's Inc.*, 707 S.W.2d 539, 540 (Tenn. Ct. App. 1986)). A defendant cannot offset a partnership liability against his individual debt to one of the other partners. *Id.* (citing *Flint v. Tillman*, 49 Tenn. 202 (Dec. 1870); *Turbeville v. Broach*, 45 Tenn. 270 (Apr. 1868)). Baril did not personally pay the amounts for payroll and bonus. There is no mutuality, and nothing is owed by Ooten to Baril, individually. Any setoff claim would fail as a matter of law. Finally, any claim by Baril for setoff for insurance coverage and phone equally fails for lack of mutuality, as in a suit by a member, a debt of the firm cannot be pleaded in setoff. The trial court correctly addressed Baril's motion to amend.

## V. CONCLUSION

For the reasons set forth herein, the judgment of the trial court is affirmed, and the case is remanded for enforcement of the court's judgment. Costs of the appeal are assessed to the appellant, Jason K. Baril.

_____
JOHN W. MCCLARTY, JUDGE